755 F.2d 416
 Margaret EYRE, Individually and as the Natural Tutrix of the
minor child, Michael L. Eyre, Plaintiff-Appellant,
and
South Carolina Insurance Company, Intervenor-Appellant,
v.
McDONOUGH POWER EQUIPMENT, INC., Defendant-Appellee.
 No. 83-4731.
 United States Court of Appeals,
Fifth Circuit.
 March 18, 1985.
 
 Davis & Stone, James D. Davis, H. Dillon Murchison, Alexandria, La., Alfred Weisbrod, Troy, Ohio, for plaintiff-appellant.
 Steven W. Cook, Alexandria, La., for intervenor-appellant S.C. Ins. Co.
 Provosty, Sadler & deLaunay, William H. deLaunay, Jr., Ronald J. Fiorenza, Alexandria, La., for defendant-appellee.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before GEE, REAVLEY, and RANDALL, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 This appeal in a Louisiana diversity case requires us to determine whether the evidence presented at trial was of such a kind and character as to require that the plaintiffs' verdict rendered by the jury be left undisturbed, or whether the trial judge's actions in granting judgment non obstante for the defendant, or in the alternative a new trial, were correct. We reverse the judgment but affirm the granting of new trial.
 
 Facts
 
 2
 The action is one in product liability and negligence for claimed design defects and failures to warn of dangerous qualities of a rotary power mower. There was only one witness to the injury, a child then nine years of age,[1] and the main body of the record consists of the conflicting views of five expert witnesses.
 
 
 3
 Michael Eyre was visiting his country cousin in the spring of 1979 when he was permitted to participate in the family chores by operating a 1978 model power riding mower manufactured by the defendant. His aunt, who had not read the operating manual furnished by defendant or its warnings,[2] instructed him cursorily in the operation of the mower, showing him the brake and clutch and the ignition key; watched him mow one circuit of the lawn; and went about other business. Some few minutes later, Michael was on his way to the emergency room with a mangled foot.
 
 
 4
 Michael's testimony about how the accident occurred was, taken with the other evidence, in two respects implausible to a degree approaching the incredible.[3] As Michael recalled his injury, he had made one circuit of the dew-wet, flat lawn in first gear--at a speed, as was undisputed, of about one and one-half miles per hour, a slow walk--when he came to a clothesline pole placed six or seven feet from a barbed wire fence. Intending to avoid the pole and reverse his course, he veered left around it and sharply back to the right. When he did so, he testified, the front end of the mower began to buck or hop up and down and the mower slid left several feet into the barbed wire. As we shall see, neither the asserted bucking nor the extreme lateral slide finds explanation or support in the testimony of the experts as likely or even as possible.
 
 
 5
 When his left hand encountered the wire, Michael bailed off the mower to the right, leaving it running at full bore. Sadly, his foot slipped under the machine and was injured. He hopped to the house, leaving the mower tangled in the wire fence and still running. After protracted medical attention, Michael's foot is usable without serious discomfort, but his big toe and much of his instep were lost. The mower remains in service with his aunt's family, without subsequent incident.
 
 Discussion
 
 6
 Plaintiffs' theories of recovery were several: the absence of a so-called "dead man" control from the mower; a claimed dynamic instability in steering it, resulting from a lack of weight located forward over the steering wheels; an absence of adequate warning of the machine's dangerous aspects; and a failure properly to test the machine to discover these asserted defects.
 
 
 7
 We are unable to see any substance in the latter two. Logically, if the machine was so seriously defective as to create liability merely for marketing it, the failure to test adequately adds nothing; if not, the same is true. And again, in logic, we are unable to envision the causal significance of the adequacy or inadequacy of warnings when those that were given were not read; presumably the most adequate ones would likewise have been ignored. Appellants cite us to no Louisiana authority to the contrary of either logical proposition, and we have found none.
 
 
 8
 As for the claimed steering instability, little supports it save Michael's own testimony of the machine's bucking and of its sliding several feet in the turn he sought to make, plus the naked conclusion of an expert, a Dr. Wright, that the machine was defectively unstable. The test run by plaintiffs' expert, however, on which he based his conclusion, entirely fails to mesh with Michael's testimony or to support the conclusion that he reached. Tested in first gear on dry grass, and thrown into as tight a turn as possible, the machine described a circle of 11'3". Tested twice on wet grass, one turn measured 11'5", another 11'8". Nothing was said by the expert of any tendency by the mower to hop or buck during these maneuvers; had any manifested itself, we think it fair to presume that he would have said so. These miniscule differences in turning radius do indeed indicate a slight tendency to slide in a tight turn on wet grass, but they offer no support whatever for Michael's claim of an uncontrolled bucking or hopping and a slide of several feet. Nor, we conclude, do they furnish any basis for the expert's opinion that the machine suffered from steering instability on flat, wet grass. To be sure, another basis for his conclusion was his observation that only about thirty percent of the machine's weight was located over its front wheels, but his own test seems to us to demonstrate that despite this circumstance the machine was not prone to slide significantly.
 
 
 9
 So far, then, it appears that the judgment of the trial court was in compliance with the law of our Circuit. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969), sets forth our standard for granting judgment notwithstanding the verdict:
 
 
 10
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence--not just that evidence which supports the nonmover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 11
 411 F.2d at 374-375 (footnote omitted). Exercising all deference to the jury's function, we are unable to see that an issue was made by substantial evidence on the three theories of recovery that we have discussed thus far. It is otherwise, however, as to that grounded in the absence of a "dead man" control.
 
 The "Dead Man" Control
 
 12
 Such a device is one that requires continuous activation by the operator for the machine to run: when the "dead hand" falls away, the machine stops. Examples are the familiar foot pedal accelerators of automobiles and the hand throttles of motorcycles, each of which closes of its own force when pressure on it ceases. The plaintiffs offered an expert witness, a Mr. Sevart, who testified that as of 1978, when the mower in question was made, the concept of such a control was (obviously) well known, that the materials and technology to produce one were available, and that one could have been placed on this machine at small incremental cost. To this, Sevart added that he had read of a few mowers then available which offered some type of such a feature, although he was not personally familiar with these, and that most offered to the public at that time had none. He then opined that the state of the art at that time was such as to have permitted the incorporation of such a device in this mower as would, by a combination of braking and clutching, have brought its blade to a stop within one second of the time Michael released the controls, that had one been present Michael would not have been injured, and that the machine was negligently designed and unreasonably dangerous for not incorporating just such a device as he described.
 
 
 13
 A. Judgment N.O.V.
 
 
 14
 As the passage quoted from Boeing makes plain, if there is substantial evidence in the record raising a relevant fact issue for determination by the jury, the decision of that issue may neither be taken from the jury nor its decision of that issue reversed by the trial judge. We cannot say that the testimony of plaintiffs' expert to which we have referred, even when taken with all the other evidence, was not--when considered in the light and with all reasonable inferences most favorably to the plaintiffs' case--substantial.
 
 
 15
 Unlike that offered on the "instability" theory, its force did not depend on accepting a child's doubtful version of how the accident occurred: however Michael departed the machine, and whatever circumstances caused him to do so, had the blade been stopped within one second of his flight it is reasonable to believe that he would not have been injured. On this record, it is very likely that a device which would have produced that result could have been designed into the mower. Under Louisiana substantive law, the absence of mowers so equipped from the market at the time of sale is a circumstance to be weighed with the other evidence, but it is not conclusive. Leathem v. Moore, 265 So.2d 270, 276 (La.App.1972) (dictum).[4] For these reasons, we conclude that the trial judge erred in granting judgment notwithstanding the verdict.
 
 B. New Trial
 
 16
 The rule governing new trial is less strict. Although in considering motions for judgment non obstante the judge may not assay the comparative weight of the evidence pro and con--only whether, in light of all the evidence, that opposed to the motion is substantial when favorably regarded--on motion for new trial he is free to do so. Bazile v. Bisso Marine Co., Inc., 606 F.2d 101 (5th Cir.1979). Deference is accorded his firsthand opportunity to view the witnesses and their demeanor, and he is empowered to grant a motion for new trial when he determines that the verdict is against the great--but not merely the greater--weight of the evidence. Conway v. Chemical Leaman Tank Lines, Inc., 610 F.2d 360 (5th Cir.1980). We review orders granting new trials for abuse of discretion, that is, for clear error. Id. at 367, n. 9.
 
 
 17
 Viewing the record in this case as a whole, and according due deference to the trial judge's first-line view of the testimony, we cannot find his determination that the verdict was against the great weight of the evidence an abuse of discretion. Mr. Sevart, although certainly qualified to opine as he did, was essentially a professional witness, with little or no experience in the actual design or manufacture of such machines as that which injured Michael Eyre. A careful reading of his testimony indicates that as of 1978, when the mower in question was sold, there was no machine on the general market which met the requirements that he characterized as state of the art: a one-second arrest time for the rotating blade upon release of a dead man control. Needless to say, the defendant's experts were of the same view. Thus a finding of liability based on Sevart's testimony would, in effect, have convicted an entire industry of negligent or unreasonably dangerous design as of that date, all on the single basis of his calculations regarding that which was theoretically possible but had actually been done by no one at that time.
 
 
 18
 To be sure, such a situation--the delinquency at a given time of all manufacturers of a particular type of machine--is conceivable, and we do not hold that it is impossible of proof, let alone that industry custom is conclusive of due care or of a want of unreasonable danger in all types of a given product. Where that custom and practice is, however, universal, as it was on this record, and where it is disputed only by the theorizing of a single expert witness in testimony that was strongly controverted by that of others at least equally qualified,[5] we cannot overturn on a cold record the determination of the trial judge that this testimony was against the great weight of the evidence.
 
 
 19
 The judgment of the trial judge notwithstanding the verdict is therefore REVERSED, and his granting of a new trial is AFFIRMED.
 
 
 
 [1]
 Michael, the victim, was just over a month short of his tenth birthday when injured, but was fourteen at the time of trial
 
 
 [2]
 Among these was one against permitting a "child" to operate the machine. The parties bicker over whether persons of common understanding would think a nine/ten year old a child; we entertain no doubt that they would
 
 
 [3]
 The trial judge viewed his testimony as unbelievable but not intentionally false, and our review of it persuades us to a similar conclusion
 
 
 [4]
 Later Louisiana decisions have followed the Leathem dictum. For example, in Leonard v. Albany Machine & Supply Co., 339 So.2d 458, 463 (La.App.1976), the court, reversing a finding of liability, observed:
 The custom of the industry, although not conclusive, may be considered when determining the duties owed by a manufacturer for its product. Leathem v. Moore, 265 So.2d 270 (La.App. 1st Cir.1972). In the instant case, the unrebutted testimony of Albany's expert, Fritz, established that the custom in this industry is to shield the trimmer by various methods after it is installed into the mill assembly line. In fact, no trimmer manufactured in the United States comes equipped with a shield.
 See also Poland v. Beaird-Poulan, 483 F.Supp. 1256 (W.D.La.1980) (Louisiana law); but cf. Harris v. Bardwell, 373 So.2d 777 (La.App.1979).
 
 
 [5]
 One of whom, for example, testified that he had himself designed one of the machines that Mr. Sevart claimed to have incorporated a type of positive blade control, that in fact it had none, and that neither of Mr. Sevart's other two examples of such controls as of 1978 had one either