**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**STATE OF DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES; John A. Dillman, III, Director of State Personnel; Dwayne Olsen, Controller General; and Steven Golding, Budget Director, Defendants.**

Civ. A. No. 83–412–JRR.

United States District Court,
D. Delaware.

Sept. 3, 1987.

Edmond Falgowski, Asst. U.S. Atty., U.S. Dept. of Justice, Wilmington, Del., Spencer L. Lewis, Jr., Issie L. Jenkins, Yolonda R. Hughes, Christopher L. Morkides, and Wanda E. Flowers, of the E.E.O.C., Philadelphia, Pa., of counsel for plaintiff.

Susan H. Kirk-Ryan, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for State of Del., Dept. of Health and Social Services.

Regina M. Mullen, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants Dillman, Olsen and Golding.

## OPINION

ROTH, District Judge.

This action was brought by the Equal Employment Opportunity Commission (EEOC) on behalf of 18 Public Health

Nurses (PHNs) employed by the Delaware Department of Health and Social Services (DHSS) at the Kent County Health Clinic and its associated satellite clinics. In addition to the DHSS, other defendants named were John A. Dillman, III, Director of State Personnel, Dwayne Olsen, Controller General, and Steven Golding, Budget Director (hereinafter collectively referred to as the DHSS). The suit was brought under the Equal Pay Act (EPA), 29 U.S.C. § 206(d), which prohibits payment of lower wages to employees of one sex than are paid to employees of the other sex for performing equal work.

Initially the case involved over 100 PHNs throughout the state. In an earlier opinion ruling on cross-motions for summary judgment, however, the scope of the case was reduced to just the Kent County Health Clinic. See Equal Employment Opportunity Commission v. Delaware Department of Health and Social Services, C.A. 83–412 (D.Del. Nov. 7, 1986). Trial was held in December, 1986, resulting in judgment for plaintiff. Presently, before the Court are defendant DHSS's motions for judgment notwithstanding the verdict and alternatively for a new trial, and plaintiff EEOC's motions for liquidated damages and prejudgment interest.

I. *Background.*

The EEOC's complaint alleges that for the relevant time period, July 1, 1980 to June 30, 1982, the DHSS paid a male Physician's Assistant (PA), Donald Bloom, a higher salary than it paid to the female PHNs, who were performing equal work. Bloom was reclassified in April, 1980, from PA II to PA III, and thereafter he earned more than any of the PHNs at the Kent County Health Clinic. The PHNs soon brought the pay differential to the attention of the relevant state officials and were reclassified as a group effective July 1, 1982.

The EPA defines "equal work" as work that requires equal skill, effort, and responsibility and is performed under similar working conditions. 29 U.S.C. § 206(d). Under the EPA, the plaintiff bears the initial burden of proving that the duties of the PHNs and Bloom were equal. Once this prima facie case is established, the burden shifts to the defendant to prove one of the four specific types of affirmative defenses that the statute lists as valid reasons for unequal pay. The four defenses are that there was a seniority system, a merit system, or a system which measures earnings by quantity or quality of production, or that the wage differential was based on a factor other than sex. See *Corning Glass Works v. Brennan,* 417 U.S. 188, 195–97, 94 S.Ct. 2223, 2228–29, 41 L.Ed.2d 1 (1974).

In addition to the alleged EPA violation, the complaint further charges that the EPA violation was willful, an allegation which, if proven, would extend the time period for bringing suit. Under 29 U.S.C. § 255(a), an action for damages under the Fair Labor Standards Act (which includes the EPA) must be brought within two years of the accrual of the cause of action, unless the violation was willful, in which case the time is extended to three years. Since this action was filed on June 28, 1983, a finding of willfulness would extend the recoverable period back an additional year from June 29, 1981, to June 29, 1980. The wage disparity alleged was eliminated in July, 1982, so that a finding of willfulness in this case would effectively double the period of time for which recovery could be made.

The case proceeded to trial on December 1, 1986, on these two issues—whether the DHSS had violated the EPA, and, if so, whether the violation was willful. The evidence was presented to a jury of six and two alternates. During the course of the trial the number of complaining PHNs was reduced from 18 to 13. At the close of the plaintiffs' case, the defendant moved for a directed verdict for two of the individual defendants, Steven Golding, the Budget Director for Delaware, and Dwayne Olsen, the State Controller General. The motion

was not opposed by the EEOC and was granted D.I. 188G, p. 35.[1]

At the conclusion of the defendants' case, both parties made motions for directed verdicts. The defendants' motion was limited to its affirmative defense that Bloom's wage increase of April, 1980 was due to a factor other than sex, namely, a valid classification system. D.I. 188G, p. 55. After hearing argument on the motions, the Court reserved decision on them, and the case was submitted to the jury on the merits.

Because one juror had already been dismissed and two others were not feeling well, the Court asked counsel for both sides if they had any objection to permitting the remaining alternate to stay with the jury for the deliberation process. Neither side expressed any objection, and, thus, a jury of seven retired to decide the case.

During their deliberations, the jury sent a note to the Court asking whether it was necessary that the sex of the employees be "used as a *basis* for determining the different wages" in order to find a violation of the EPA. D.I. 188H, p. 74 (emphasis in original). After consulting with counsel for both sides, the Court responded to the jury:

> In answer to your note, I simply want to say that I have instructed you on the affirmative defenses, beginning on page 10 through page 12 of my instruction [a copy of which had been given to each juror]. It is up to you to determine if any one of these affirmative defenses is applicable here, and if so, if the defendant has persuaded you by a preponderance of the evidence that it applies.
>
> Why don't you take your instructions back to the jury room. If, after re-reading them, you continue to have a question, send out another note and we will deal further with it.

D.I. 188H, p. 79. No further note was received by the Court, and shortly thereafter the jury returned with a verdict.

The jury found in favor of each of the 13 PHNs and also found that the EPA viola-

tion had been willful. The defendants requested that the jury be polled, however, and when the seventh juror was polled, the following exchange occurred:

> THE CLERK: Juror No. 7, is this the verdict you have agreed upon?
>
> JUROR NO. 7: I was considered an alternate.
>
> THE COURT: I thought the alternate realized she would participate in the discussion.
>
> JUROR NO. 7: But when it—when they agreed, I thought it was only those six to be considered, as far as voting.

D.I. 188H, p. 82. Once the Court explained to Juror No. 7 that she was expected to vote, she indicated she did not agree with the verdict. The Court then asked her how her verdict differed.

> JUROR NO. 7: How?
>
> THE COURT: Yes.
>
> JUROR NO. 7 May I just say that I just didn't agree that—I didn't feel they—it was proven that the State willfully discriminated.
>
> THE COURT: So that your verdict differed as to the point of willfulness.
>
> JUROR NO. 7: Yes.

D.I. 188H, p. 83. After clarifying the seventh juror's position, the Court dismissed the jury. Both parties have filed post-trial motions challenging part or all of the verdict. The EEOC takes the position that the seventh juror was not a voting member of the jury, and that there was a unanimous 6–0 verdict for both the EPA violation and the issue of willfulness. The EEOC has also moved for prejudgment interest and liquidated damages, based on its position regarding the verdict.

The DHSS has moved for summary judgment notwithstanding the verdict (j.n.o.v.), and alternatively, for a new trial. It takes the position that the seventh juror was a full voting member of the jury, and that if a j.n.o.v. is not granted, a new trial is required because of the jurors' confusion and the failure to reach a unanimous ver-

---

1. Since the transcript of the trial appears in a number of volumes, each separately paginated and filed in the Clerks Office, references to the trial transcript will appear as a docket item number, and a page number.

dict on willfulness. We will consider the motion for j.n.o.v. first.

## II. *Judgment Notwithstanding The Verdict.*

In support of its motion for j.n.o.v., the DHSS argues that there is not substantial evidence to support the EEOC's *prima facie* case on the issue of whether the working conditions for Bloom and the PHNs were similar. It also asserts that there was no evidence to support the finding of willfulness. The EEOC objects that the DHSS may not raise the similar working conditions or willfulness grounds on a motion for j.n.o.v. because they were not raised in the DHSS's directed verdict motion. It also argues that there was sufficient evidence to support a finding that the DHSS had not proved its affirmative defense, so that a j.n.o.v. is not appropriate.

### A. *The Scope Of A Motion For Judgment Notwithstanding The Verdict.*

A motion for a j.n.o.v. under Fed.R.Civ.P. 50(b) may only be considered by the trial court if the moving party has previously made a motion for a directed verdict, and that motion has been denied, or at least not granted. In such a case, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Fed.R.Civ.P. 50(b). The "later determination" is made upon a motion j.n.o.v.

■ Furthermore, the j.n.o.v. motion is limited in scope to those issues raised in the directed verdict motion. *See Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802, 814 (3d Cir.), *cert. denied* — U.S. ——, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1984). As the *Bonjorno* court stated, these prerequisites to a motion for j.n.o.v. are designed to protect the seventh amendment rights of the non-moving party, which would be jeopardized if the court were to decide issues after they were submitted to a jury. *Id.* Further, the motion for directed verdict gives the non-moving party an opportunity to present additional evidence and bolster its case in areas that may be deficient before the case goes to the jury. *Id.*

■ In this case, the DHSS's motion for a directed verdict, as stated above, was limited to its affirmative defense. Also, its motion for a directed verdict at the close of the EEOC's case was restricted to only two defendants, on whom no evidence was presented at all. Yet, in its brief in support of the motion for j.n.o.v., the DHSS includes as a ground the argument that the jury could not reasonably have found that the working conditions for Bloom and the PHNs were similar, which is part of the EEOC's prima facie case. The brief also includes the argument that the jury's verdict on willfulness is not supported by substantial evidence.

To consider these grounds for j.n.o.v. now would do violence to the policies that underlie Fed.R.Civ.P. 50(b). The DHSS has given no notice to the EEOC that it intended to challenge these aspects of the case, and the EEOC had no chance to attempt to strengthen its case in these areas. If we took these issues from the jury *ex post facto,* we would jeopardize the nurses' seventh amendment rights to a trial by jury. Therefore, we will limit our consideration of the j.n.o.v. motion to the DHSS's affirmative defenses.

### B. *The Standard For Granting A J.N.O.V. Motion.*

A judgment notwithstanding the verdict may be granted only when the evidence, together will all reasonable inferences that may properly be drawn from the evidence, is so one-sided that reasonable persons could not disagree over the verdict. *Aloe Coal Company v. Clark Equipment Co.,* 816 F.2d 110 (3d Cir.1987); *Carter v. Duncan-Huggins, Ltd.,* 727 F.2d 1225, 1227 (D.C.Cir.1984); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1546 (Fed.Cir.1983); *Schering v. Precision-Cosmet Co., Inc.,* 614 F.Supp. 1368, 1371 (D.Del.1985). It is not necessary that there be *no* evidence or inference to support the verdict, but the record must be "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."

*Danny Kresky Enterprises Corp. v. Magid,* 716 F.2d 206, 209 (3d.Cir.1983) (quoting *Dudley v. South Jersey Metal, Inc.,* 555 F.2d 96, 101 (3d.Cir.1977)). In reviewing the trial record, the court must consider all the evidence, but may not weigh the credibility of witnesses or displace the jury as the trier of fact. *Connell,* 722 F.2d at 1546. In essence, the court must diligently search the record for sufficient evidence and reasonable inferences to support the verdict and must fail in its search, before granting a judgment notwithstanding the verdict.

In cases where the burden of proof at trial rests on the party seeking j.n.o.v., the burden for establishing the j.n.o.v. is even greater. *Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495, 499 (10th Cir.1984); *Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 (3d Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). The higher burden is not due to the application of a different standard, but rather to the different perspective from which the court views the evidence. Instead of testing the sufficiency of the evidence, the court must measure the evidence for its "overwhelming effect." *Hurd,* 734 F.2d at 499. The moving party must show that it carried its burden of proof at trial so clearly and completely that no reasonable jury would fail to find in its favor. *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co.,* 427 F.2d 1273, 1275 (3d Cir.1970); *Gatenby v. Altoona Aviation Corp.,* 407 F.2d 443, 445–46 (3d Cir.1968); *see also Fireman's Fund,* 540 F.2d at 1177. Since the grounds for the DHSS's motion for j.n.o.v. lie in its affirmative defense, it is this higher standard which applies.

C. *The Evidence Presented At Trial.*

■ The DHSS presented evidence at trial on the fourth affirmative defense, which showed that the pay differential was due to a factor other than sex. Specifically, it asserted that the State had in place a valid classification system, and that all decision made regarding wage levels for Bloom and the PHNs were made under that system.

In support of its affirmative defense, the DHSS presented evidence that Bloom's 1980 reclassification and pay raise, which created the wage disparity, were based on the fact that he had recently earned a college degree and had received increased job responsibility and independence. D.I. 188E, pp. 72–73. Bloom's classification was changed from PA II to PA III, and with the new classification came a new pay level. There was further evidence that none of the PHNs or state officials thought that sex was a factor in Bloom's higher wage level. The PHNs requested a review of their classification simply because they believed that they were performing the same duties as Bloom, but getting less money.[2]

The DHSS also presented evidence that the State of Delaware uses a classification system known as the Hay System. This system assigns point values to job and pay grades within the system based on weighted factors. As William Steele of the State personnel office testified at trial:

> Jobs are looked at using three anchors. The knowledge that is required in order to perform the job, the knowledge—know-how is the term they use—and it is any type of knowledge you have to have when you come into the job in order to qualify for the position. The know-how is broken into three sections: the required knowledge, any education and/or experience that is required in order to do the job, any management or supervisory skills that are required in order to do the job and any human relations factors that might be involved in the job.
>
> The second factor is the problem-solving that is required in the position. What kind of problems do you have?

---

2. One of the PHN plaintiffs testified that the PHN job positions were equal to the position of PA Bloom:

> At the time that we filed, we felt that the job positions were equal, that we were doing equal work, and, therefore, we desired equal pay. If Mr. Bloom had been an orangutan or a martian or a female, we still would have filed.

D.I. 188A, p. 38.

How much independent thinking do you have to have in order to do your work?

And the third factor is the accountability, how much accountability does a person have to accomplish the function of the job, and what impact does the job have on the state as a whole?

D.I. 188G, pp. 38–39. The DHSS presented evidence that the Hay System is widely used for classifying public employees. At the time that Bloom completed his college degree, he requested reclassification. His duties and qualifications were re-evaluated under the Hay System, resulting in a point score that merited his reclassification from PA II to PA III.

The EEOC did not present any evidence that challenged that validity of this reclassification process or that suggested that this system was misused or misapplied. Instead, the EEOC presented evidence that the reclassification of the PHNs took approximately two years from the time that a PHN brought the wage disparity to the attention of state personnel officials up to the effective date of new classification for PHNs. In contrast, the EEOC brought out that Bloom's reclassification took only four months. The EEOC asserts that this evidence is enough to allow a jury to infer that the reclassification process was applied in a sexually discriminatory way and was, therefore, invalid as an affirmative defense.

The DHSS responds to this by noting that evidence was presented that tended to explain the difference in the length of the two reclassifications. In Bloom's case, only one person was involved, and the reclassification was simply a matter of moving that individual into a different category. On the other hand, the reclassification of the PHNs was a much more involved process known as a "regrade," that is, a re-evaluation of the various PHN categories covering over one hundred nurses throughout the state, focusing on the duties and qualifications of all PHNs, to see if the entire group should receive a

wage adjustment. D.I. 188E, pp. 49–51. There was also evidence that the office handling such regrades and reclassifications received a large volume of requests and was very busy. *Id.* p. 51.[3]

Taking all this evidence into consideration and allowing for all reasonable inferences in favor of the plaintiff, we nevertheless conclude that a reasonable jury could only have found in favor of the defendant on the issue of its affirmative defense. The only evidence presented by the EEOC to refute the validity of the State's classification system is that it took much longer for the PHNs to be collectively regraded than it took for Bloom to be reclassified. The DHSS offered evidence that explained this difference in terms that had nothing to do with sex discrimination. The EEOC, on the other hand, offered no evidence to contradict or refute this explanation, and merely asked the jury to believe that the delay must have been due to sex discrimination, which the jury apparently did. Bald speculation that the State was applying its facially neutral classification system in a sex-biased manner is not sufficient to support a verdict, even under the standards for j.n.o.v. which give a great deal of leeway to the jury as trier of fact. Such speculation flies in the face of the uncontroverted evidence which explained the longer regrade review, involving the PHNs, in terms that are consistent with a valid classification system. The jury is not permitted to ignore evidence that favors one party in order to find for the other party unless that finding is supported by some different or conflicting evidence. Therefore, we will grant the defendants' motion for judgment notwithstanding the verdict on their affirmative defenses.

### III. *The Motion For A New Trial.*

Under Fed.R.Civ.P. 50(c), whenever a motion for j.n.o.v. is accompanied by an alternative motion for a new trial, the court must decide both motions, even if it grants

---

**3.** The EEOC presented other evidence, relating to Bloom's actual duties and responsibilities as compared to those of the PHNs. This evidence goes to the EEOC's *prima facie* case, however, and does not bear on the DHSS's affirmative defense that Bloom's raise was the result of a valid classification system.

the j.n.o.v. Since we have already granted a j.n.o.v. in favor of the defendant, our ruling on the new trial motion will be conditional, and will only take effect if the j.n.o.v. is reversed or vacated on appeal. *See 5A J.W. Moore, Moore's Federal Practice,* ¶ 50.13[1] (1986).

The defendant makes several arguments in support of its motion for a new trial. First, the DHSS argues that the jury disregarded the Court's instruction concerning the similar working conditions. The DHSS further argues that the jury's verdict was against the clear weight of the evidence in that it found that Bloom and the PHNs performed equal work, under similar working conditions, that no factor other than sex was the basis for Bloom's promotion in 1980, and that the violation by the State was willful. The DHSS goes on to argue that the seventh juror did not participate fully in the deliberations, as she was expected to do, and that the verdict on the willfulness issues was not unanimous. Finally, the DHSS argues that the Court committed two errors that require a new trial. The first asserted error was in allowing excerpts from the deposition of Linda Garber, one of the complaining PHNs, who was not present at trial, to be read into the record. The other asserted error was in not giving supplemental instructions to the jury when it sent out a question concerning the law regarding the affirmative defenses.

The EEOC responds to each of these arguments in turn. First, the EEOC asserts that the seventh juror was not intended to vote on the verdict unless another juror became ill, so that the actual verdict on willfulness should be considered a unanimous six to zero. The EEOC also argues that there was sufficient evidence to support the jury's finding on the similar working conditions, and all other aspects of the verdict. Finally, the EEOC contends that the Court committed no errors either in allowing the deposition testimony or in instructing the jury.

### A. *The Standard For Granting A New Trial.*

New trials may be granted under Fed.R. Civ.P. 59(a), on some or all issues in a case, on a variety of grounds, which are generally treated less strictly than the grounds for j.n.o.v. *See Brown by Brown v. Syntex Laboratories, Inc.,* 755 F.2d 668, 673 (8th Cir.1985). Among the proper grounds for a motion for a new trial are the three that the DHSS raises here—judicial error, *see* 6A *Moore's,* ¶ 59.08[2]; jury mistake or misconduct, *id.,* ¶ 59.08[4]; and verdicts not supported by the evidence, *id.,* ¶ 59.08[5]. Since motions for a new trial are governed by Rule 59(a), rather than Rule 50, the prerequisite of moving for a directed verdict does not apply. The reason for this is clear. When a court grants a new trial, rather than taking the case or issue from the jury and substituting its own judgment, it merely allows both parties to present their cases again to a new jury. Thus, all the grounds raised by the DHSS are properly before the Court on the motion for a new trial, including the issues that were not raised in the directed verdict motions.

Although the permissible grounds for a new trial motion are numerous and varied, it is useful in this case to group them into general categories. *See Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90–91 (3d Cir.1960). One category of grounds challenges the validity of the deliberations and verdict by the jury, essentially on the basis that the jury erred or was confused about the evidence or instructions, and, therefore, failed to reach a supportable verdict. *See Rose Hall Ltd. v. Chase Manhattan Overseas Banking,* 576 F.Supp. 107, 124 (D.Del. 1983), *aff'd* 740 F.2d 956 (3d Cir.1984). In this situation the Court must evaluate the judgment of the jury to decide whether the verdict reached was consistent with the weight of the evidence and with the instructions. In deciding such a motion, the Court must evaluate and compare the strength of the evidence on each side of the issues involved. *See Eyre v. McDonough Power Equipment, Inc.,* 755 F.2d 416, 420 (5th Cir.1985). The Court, thus, necessarily intrudes to some extent into the traditional domain of the jury as the trier of fact, which means that this type of grounds for a new trial must be more closely scrutinized than the other category. *See Rose*

*Hall,* 576 F.Supp. at 124. It nevertheless falls within the trial court's discretion to grant such a motion in order to avoid a miscarriage of justice. *See Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1102 (5th Cir.1981). Two of the DHSS's grounds for a new trial are of this type: that the verdict was against the weight of the evidence and that the jury failed to follow the Court's instructions.

The second category of grounds for a new trial includes errors or misconduct on the part of the others in the presence of the jury that may improperly influence the deliberations and verdict. *See Lind,* 278 F.2d at 90. Such errors or misconduct may be committed by attorneys, witnesses, parties or the court. Such errors can impede or influence the jury deliberations even though the jury itself acts without fault. If the court determines that such an error has prejudiced the moving party, a new trial is appropriate. *See* 6A *Moore's,* ¶ 59.08[2]. In considering this type of ground, the court does not usurp the jury's factfinding function, and, therefore, greater discretion is afforded to the court to order a new trial. *Lind,* 278 F.2d at 90; *see also Rose Hall,* 576 F.Supp at 124. The assertion by the DHSS that the court erred falls within the category. Also, the argument that the verdict was not unanimous will be considered within this category.

### B. *Verdict Unsupported By The Evidence.*

The defendant's primary grounds for a new trial is that the jury's verdict is against the weight of the evidence—an argument similar to that used in support for its j.n.o.v. motion. The standard for granting a new trial on this ground is whether the verdict is against the greater weight or clear preponderance of the evidence. *Eyre,* 755 F.2d at 420; *Brown by Brown,* 755 F.2d at 673; *Rose Hall,* 576 F.Supp. at 124. Although this standard is lower than that required for a j.n.o.v. motion, the court is still not permitted to substitute its own fact-finding for that of the jury. The court must limit its evaluation of the evidence to a determination of whether the verdict is in conflict with the clear weight of all the evidence and permissible inferences. *Rose Hall,* 576 F.2d at 124.

The DHSS attacks all aspects of the verdict in this motion, including the findings that Bloom and the PHNs performed equal work, that they worked under similar working conditions, that the difference in pay was not due to a valid classification system, and that the violation of the EPA was willful.[4]

The EEOC's prima facie case required it to prove that the PHNs and Bloom performed equal work under similar working conditions. Equal work includes work requiring equal skill, effort, and responsibility under the terms of the EPA. The proper focus is on the actual duties performed by each employee, rather than job descriptions or classifications. *Katz v. School District of Clayton, Missouri,* 557 F.2d 153, 156 (8th Cir.1977).

Much of the testimony during the trial concerned the duties performed by Bloom and each of the complaining PHNs. Each nurse had her own individual schedule, combining home visits with rotations through the different clinics at the Williams Center and its satellites. The EEOC presented evidence, however, that the duties performed in each setting were basically the same in terms of skill, effort, and responsibility. The nurses performed physical examinations and took histories, occasionally gave immunizations, and performed miscellaneous administrative duties. Their examinations called upon their knowledge and experience to observe the overall behavior and health of each patient.

There was testimony presented that Bloom was in charge of a team that included different PHNs, but this testimony was not uncontroverted. Also, there was evidence that home visit examinations involved fewer instruments than clinic examinations, and that fewer home visits could

---

**4.** The jury specifically found willfulness; the other three findings were necessary steps for it to reach a verdict in favor of plaintiff, but were not separate verdicts.

be performed in a day. However, other evidence indicated that clinic appointments were frequently broken, and that any differences between exams given in the home and the clinic were insignificant in terms of skill and effort required for each job. Thus, after considering the evidence on both sides of this issue, we cannot say that the great weight of the evidence supports a finding that the jobs did not require equal skill, effort, and responsibility. On this issue, we think a finding either way by the jury would be proper.

▆ With regard to the requirement that the EEOC prove similar working conditions as part of its prima facie case, the DHSS asserts that the clear weight of the evidence indicated that ten of the thirteen PHNs spent at least half their time making home visits, while Bloom's duties were performed exclusively in a clinic setting. Under the EPA, the DHSS argues, these cannot be "similar working conditions." The regulations that define this term cite two examples of jobs that are not performed under similar working conditions, both of which were quoted in the jury instructions:

> For example, if some sales persons are engaged in selling a product exclusively inside a store and others employed by the same establishment spend *a large part of their time* selling the same product away from the establishment, the working conditions would be dissimilar. Also, where some employees do repair work exclusively inside a shop while others employed by the same shop *spend most of their time* doing similar repair work in customers' homes, there would not be similarity in working conditions. On the other hand, slight or inconsequential differences in working conditions that are essentially similar *would not justify* a differential in pay.

29 C.F.R. § 800.132 (1986) (emphasis added); *see also* D.I. 188H, p. 64.

The similarity between those two examples and the situation involved in this case is striking, especially the second example which refers to the performance of services. At trial, it was established that Bloom worked exclusively in a clinic setting. D.I.

188B, p. 27. In contrast, ten of the thirteen PHNs testified that they spent at least half of their time making home visits. *See* D.I. 188A, p. 60 (Nurse Wiley spent only one to two days per week in the clinic); *id.*, p. 132 (Nurse Bundy spent only one day per week in the clinic); *id.*, p. 165 (Nurse Jones had mostly field duties, and most clinic work was as a backup or in a satellite clinic that was open only two days per month); *id.*, p. 115 (Nurse Rogers spent half of her time in home visits); D.I. 188C, p. 40 (Nurse Newnom spent only one day per week in the clinic); *id.*, p. 52, 54 (Nurse Dalton performed mostly home visits, averaging 60 per month); *id.*, p. 94 (Nurse Charles spent half her time performing home visits); *id.*, p. 126–27 (Nurse Kessler spent only one to two days per week in the clinic); *id.*, p. 140–41 (Nurse Slocum worked mostly in the field). The three other PHNs—Nurse Lacy, Nurse Reid, and Nurse Garber—had duties primarily in the clinic setting.

The testimony at trial established that home visits included physical examinations, similar in nature to those performed in the clinics. There was also evidence that the home examinations would not involve all the same equipment that was available in the clinic, but that they were nevertheless equally thorough examinations.

Under the law, as given in the quoted regulations, the only reasonable interpretation is that home visits and clinic work are not performed under similar working conditions. The example involving the repairs in the shop versus repairs at the customers' homes is particularly apt, since it refers to the rendering of similar services in both settings. While the shifting of PHNs among the various clinics could be found to be "slight or inconsequential differences in working conditions," the distinction between clinic and home examinations is clearly a case of dissimilar working conditions. Only if the example in the regulations involved "nurses" rather than "repair persons" could the applicability of the regulation be more clear. Therefore, for the ten PHNs whose work was performed in the home setting at least half the time, we

must conclude that the finding of similar working conditions was against the great weight of the evidence.

■■■ The DHSS challenges this aspect of the verdict on the ground that the jury failed to follow the Court's instructions, either because of confusion or conscious disregard of them. When it appears from the verdict that the jury was confused about the court's instructions and that such confusion has prejudiced the party moving for a new trial, it is within the court's discretion to grant a new trial in the interest of justice. *Nissho-Iwai Co. Ltd. v. Occidental Crude Sales*, 729 F.2d 1530, 1538 (5th Cir.1984); *McCormick v. City of Wildwood*, 439 F.Supp. 769, 773 (D.N.J. 1977) (quoting *Colonell v. Goodman*, 78 F.Supp. 845, 849 (E.D.Pa.), *aff'd* 169 F.2d 275 (3d Cir.), *cert. denied*, 335 U.S. 870, 69 S.Ct. 166, 93 L.Ed. 414 (1948)). The same is true when it appears that the jury has consciously failed to follow the court's instructions, causing prejudice to the moving party. *Shushereba v. R.B. Industries, Inc.*, 104 F.R.D. 524, 529 (W.D.Pa.1985); *McCormick, supra*, 439 F.Supp. at 773; *see also Feinberg v. Mathai*, 60 F.R.D. 69, 71 (E.D.Pa.1973); 6A *Moore's*, ¶ 59.08[4], at 59–124 to 59–125.

■■■ In this case, whether due to confusion or to a conscious failure to adhere to the law given to it, the jury's conclusion that Bloom and the PHNs all worked under similar working conditions misconstrues the applicable law. It is also clear that the DHSS was prejudiced by this failure, since a correct application of the law would have led the jury to find in the DHSS's favor against at least ten of the PHNs. We must, therefore, grant a new trial in order to avoid injustice.

■■■ Further, although it is possible that the jury error affected only ten of the thirteen PHNs, we think it proper not to limit the new trial to those ten PHNs. It is settled that a new trial should not be limited to partial issues unless they are clearly distinct and separate from the remainder of the case. *Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931);

*Feinberg, supra*, 60 F.R.D. at 70. Because the jury error is likely to have affected the verdict of all thirteen of the PHNs, the interests of justice require that the new trial include all thirteen PHNs.

The DHSS also challenges the verdict as it relates to the affirmative defense that the difference in pay was due to a valid classification system. We have already granted the defendant's motion for j.n.o.v. on this issue, which falls under a stricter standard than a motion for a new trial. Needless to say, following the reasoning that led to our granting the j.n.o.v., we also find a fortiori that the verdict that the DHSS failed to establish its affirmative defense went against the great weight of the evidence.

■■■ Finally, the DHSS argues that the verdict finding willfulness is against the great weight of the evidence. If a violation of the EPA is shown to be willful, then the statute of limitations for that violation is increased from two or three years, giving the plaintiffs an extra year for which to recover.

The Third Circuit has stated that the standard for willfulness under the EPA requires that the violation be committed intentionally or with reckless disregard for whether the EPA was violated. *Brock v. Richland Shoe Co.*, 799 F.2d 80, 83 (3d Cir.1986). This standard specifically rejects mere negligence as too lax to be included in the definition. *Id.* Thus, it is not enough to show that the State officials responsible for the pay differential *should have* known that there was most likely an EPA violation. The Third Circuit concluded that such a broad standard would make virtually all employers subject to the longer statute of limitations, contrary to Congress's intent. *Id.*

The EEOC and DHSS both presented evidence at trial of the reaction among the PHNs to the promotion of Donald Bloom to PA III. There was a great deal of unhappiness among the PHNs that a PA, an employee from a job classification that did not have the professional recognition or licensure requirements of the Registered

Nurses in the PHN classification, should be receiving more money for doing the same work as Registered Nurses. Bernice Howe, the head nurse at the Williams Center, sent a memorandum, entitled "Merit System Classifications", to Dr. George Bender, Deputy State Health Officer, which documented this concern:

As the nursing staff and I discussed with you, we have become aware of some irregularities in the Merit System Classification scheme.

The issues seem to involve equal pay for equal work; basic preparation for positions; responsibility and accountability; and licensure and credentialing.

The impetus, as you know, comes from the realization that a P.A. position is graded higher than PHN's who carry out identical as well as more extensive duties than a P.A. In addition, they have more specialized and credentialed preparation. We are aware that nurses are not the only professional group affected by incongruities in the system, and there are a number of non-professional positions at the same pay grade and in some instances higher than other professionals.

Howe Memo, May 30, 1980, Plaintiffs' Trial Exhibit No. 4.

Dr. Barbara B. Rose, Director of the Division of Public Health, received a copy of Mrs. Howe's Memorandum and passed it on to William Young, the Director of the State Personnel Office, with her own memorandum, entitled "Equal Pay for Equal Work", asking for a review of the PA and PHN classifications (Plaintiffs' Trial Exhibit No. 5.). Dr. Rose's memorandum set forth the professional nurses' concerns:

It would appear that the problem was precipitated with the reclassification of a Physician's Assistant II position, pay grade 22 to a Physician's Assistant III, pay grade 24. Incumbents in these positions may come from a variety of backgrounds and are neither certified nor licensed in the State of Delaware. They function only at the discretion of a licensed physician who should in fact be readily available for supervision.

Public health nurses on the other hand have met National educational and certification standards and are licensed in the State of Delaware. Such nurses with specialized training are certainly capable of providing a broader range of services than can a Physician's Assistant. Furthermore, the services they provide may often be given in an isolated setting in contrast to Physician's Assistants who as pointed out should have readily available back up and consultation. Additionally, public health nurses may carry their own professional liability and on physicians' orders administer parental medications. The concept that from different backgrounds one can approach a certain level of expertise in a given area of activity is understandable. However, since the reasons for certification and licensing are to assure the public of a certain level of competency, a concept which this Department strongly supports, it is requested that a review be instituted which would address these position classifications from the point of view of equal pay for equal work and thus ensure that licensed and certified professionals in pay grades 21 through 23 be at least reimbursed at pay grades equal to non-licensed personnel who perform the same tasks.

Dr. Rose testified at trial that she did not see the problem as one of sex discrimination:

Q. When you wrote your memo to Mr. Young, did you see the concerns that the nurses were expressing as a sex discrimination issue?

A. Never crossed my mind.

Q. Had the Physician's Assistant in Kent County been a female, would you have written the same memorandum?

A. Yes. Yes. Definitely.

D.I. 188G, p. 22. There had in fact been women in the Physician's Assistant classification, including the period 1980–82. D.I. 188G, p. 20; D.I. 188F, p. 66.

William Greve, Personnel Administrator for DHSS, also received a copy of Dr. Rose's memorandum to William Young. Greve interpreted the memo as asking for a maintenance review to determine if the

**1070**

class specifications, which describe the duties of the positions of PHN I, II and PHNS (supervisor) and PA I, II and III should be revised, new classes created, or pay grades changed. The request for reclassification was not looked upon by Greve or any other state official as a complaint of sex discrimination until the January 1982 contact by the EEOC. D.I. 188G, pp. 12, 13, 18. Indeed, the PHNs also testified that they had not considered the matter to be an issue of sex discrimination. Several PHNs stated that they would have made the same complaint if the PA promoted had been a woman instead of a man. *See, e.g.,* D.I. 188A, p. 38; D.I. 188C p. 109.

Since there was no evidence that any state official actually knew there might be a problem with sex discrimination, the question presented to the jury basically became whether the state officials recklessly disregarded the potential EPA violation. Based on the evidence of what information the PHNs gave to the state personnel officials and of those officials' familiarity with federal employment law, we can only conclude that none of the defendants recklessly disregarded the potential EPA violation. Nothing in the communications between the PHNs and the personnel officials indicates anything more than a simple failure to realize that sex discrimination could become an issue. We find from the evidence that the most that could reasonably be inferred is that the state officials were merely negligent in not foreseeing the potential sex discrimination involved in the PHNs' request for a regrade. We, therefore, conclude that the jury's verdict on willfulness was against the weight of the evidence, and we will also grant a new trial on this issue.

In summary, upon our review of the evidence presented at trial, we find that the verdict on the issue of equal work involving equal skill, effort, and responsibility is not contrary to the great weight of the evidence. However, we conclude that as to the issues of similar working conditions, of the affirmative defense of a valid classifica-

tion system, and of willfulness, the verdict is against the great weight of the evidence. We also conclude that with regard to the similar working conditions instruction, the jury was either confused or consciously disregarded the law as set forth in the instructions. For all of these reasons, we will grant the defendant's motion for a new trial on the above ground.

### C. *Non-Unanimous Verdict.*

The second ground that the DHSS has put forth in its new trial motion is that the verdict was not unanimous and that the seventh juror did not understand her role in the deliberation process. On the last day of trial, after closing argument and just before the jury was brought in to receive the Court's instructions, the Court asked the attorneys for both sides if they would agree to having the alternate juror remain on the jury for its deliberations. Two of the jurors had complained that they were not feeling well, and the Court suggested to the attorneys that, if by chance one of the jurors became ill and could not stay through the entire deliberations, there would still be a six member jury left. D.I. 188H, p. 52. Neither side objected or questioned the intent of the Court as to the proper role of the seventh juror, if all jurors remained healthy.

Included in the Court's instructions to the seven jurors was the requirement that their verdict be unanimous:

> The verdict must represent the considered judgment of each juror. In order to reach verdict, it is necessary that each juror agree. Your verdict must be unanimous.[5]

D.I. 188H. p. 70. The Court told the jury at the conclusion of the instructions, that the alternate would stay with the jury and join in the jury deliberations. *Id.,* p. 72.

When the jury returned with its verdict and was polled at the request of the DHSS, the seventh juror stated, when asked if she agreed with the verdict, "I was considered

---

**5.** Each juror was also provided with a copy of the Court's instructions to refer to during the deliberations.

an alternate." Under further questioning by the Court as to what her verdict was, she stated that she agreed with the rest of the jury that there had been an EPA violation, but did not agree that it had been willful:

> By the time that I was there with the discussion of them, I came around to the point where, yes, there was the—they were entitled to their—how can I say it? That yes, for the defendant—for the plaintiffs, but I didn't feel it was willful. I did not come around to that way of thinking.

*Id.*, p. 83–84. After the jury was dismissed, the EEOC took the position that the seventh juror had been merely an alternate who was not entitled to join in the actual verdict unless another juror became ill. Thus, the EEOC argued, there was a unanimous verdict of six jurors on both the EPA violation and willfulness. The DHSS took the position that the seventh juror was a voting member of the jury, and that there had not been a unanimous verdict on willfulness. The DHSS has not directly attacked the unanimity of the verdict on the EPA violation.

The requirement of unanimity of verdicts is one of the basic precepts of our jury system. *See Patton v. United States,* 281 U.S. 276, 288–89, 50 S.Ct. 253, 254–55, 74 L.Ed. 854 (1930). This long-standing axiom if reflected in Fed.R.Civ.P. 48, with the sole caveat that the parties may stipulate to non-unanimous verdicts. Absent a clear stipulation, however, a unanimous verdict is mandatory under Rule 48. *Masino v. Outboard Marine Corp.,* 88 F.R.D. 251, 253 (E.D.Pa.1980), *aff'd,* 652 F.2d 330 (3d Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981).

In this case, there simply was no stipulation to a less-than-unanimous verdict. *See* D.I. 188H, p. 70. Since the verdict on willfulness was not unanimous, a new trial is required on that issue.

Faced with the inevitability of this conclusion, the EEOC argues that the more reasonable and valid interpretation is that the seventh juror was intended to deliberate with the jury, but not to vote unless one of the other six became ill. We cannot accept this interpretation. The EEOC apparently maintains that enlarging the jury from six to seven with the consent of both parties was clear error. We think, however, that the clear error would have been to send a "stranger" into the jury room who could argue and influence the other jurors and be influenced by them, but who would not have the opportunity or responsibility of participating in the actual verdict. *See United States v. Watson,* 669 F.2d 1374, 1391 (11th Cir.1982); *United States v. Allison,* 481 F.2d 468, 472 (5th Cir.), *aff'd after remand,* 487 F.2d 339 (5th Cir. 1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); *United States v. Virginia Erection Corp.,* 335 F.2d 868 (4th Cir.1964).

The EEOC seems to argue that the parties actually consented to waive the mandate of Fed.R.Civ.P. 47(b), under which alternates must be dismissed after the jury is sent to deliberate, unless they have already replaced regular jurors. *See Virginia Erection, supra,* 335 F.2d at 870. In the *Virginia Erection* case, the trial court was reversed for sending an alternate into the jury room, even though the alternate had been instructed not to deliberate. The cases that EEOC cites support the distinguishable proposition that, under certain factual circumstances, an alternate may be retained by the court and substituted into the jury if a juror fails to appear or becomes unable to continue during deliberations. *Seese v. Volkswagenwerk A.G.,* 648 F.2d 833, 847 (3d Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981) (court sent new jurors in and instructed reconstituted jury to start deliberations over); *United States v. Barone,* 83 F.R.D. 565 (S.D.Fla.1979) (alternate was isolated from jury until substitution was made). The EEOC also cites *La-Tex Supply Company v. Fruehauf Trailer Division, Fruehauf Corp.,* 444 F.2d 1366 (5th Cir.), *cert. denied,* 404 U.S. 942, 92 S.Ct. 287, 30 L.Ed.2d 256 (1971), in which an alternate was permitted to sit in the jury room during deliberations. In that case, however, the alternate was instructed not

to participate, unlike the seventh juror in this case. Since that decision, moreover, the Fifth Circuit has reaffirmed the absolute prohibition on allowing non-voting alternates to participate in any way in deliberations. *See Allison, supra,* 481 F.2d at 472. We simply find no support or merit to the EEOC's position that the seventh juror was intended to be anything less than a full voting member of the jury.

### B. *Judicial Error.*

The DHSS has also asserted that the Court made two errors that are grounds for a new trial. The first challenged act was our decision to allow the deposition of Nurse Garber, a complaining PHN, to be read into the record because she was not available for the trial. The second asserted error was our decision not to supplement our instructions when the jury had a question, but simply to refer the jurors to the relevant position of the written instructions that they each had been given.

Since we have already granted the DHSS's motion for a new trial, we see no need to address these grounds. We will note, however, that if a second trial is held, the reason which led us to allow the use of Nurse Garber's deposition will not be a consideration. On November 7, 1986, less than a month before trial, we issued an opinion that reduced the number of PHNs in the suit from 106 to 17, and that held that each complaining nurse must testify as to her specific duties. Until we issued that opinion, the EEOC had a good faith basis to believe that not every nurse's testimony would be necessary, and that Nurse Garber would not need to be present at trial. This excused to a large extent the EEOC's less than rigorous attempts during the time left before the trial to either compel her presence or make alternative arrangements to have a more recent deposition available. The DHSS's second ground, challenging the Court's response to the jury's question, has no merit.

We will also not address the EEOC's motions for prejudgment interest and liquidated damages, for the obvious reason that the judgment upon which these motions are based has been reversed and vacated by this decision.

### Conclusion

For all the reasons stated above, we will grant the DHSS's motion for a judgment notwithstanding the verdict, and in the alternative, grant the motion for a new trial.