UNITED STATES of America,
Appellee,

v.

VIRGINIA ERECTION CORPORATION
and John P. Shields, Appellants.

No. 9187.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 15, 1964.

Decided Aug. 5, 1964.

James E. McLaughlin, Pittsburgh, Pa. (James P. McArdle, McArdle, Harrington & McLaughlin, Pittsburgh, Pa., and Fred B. Gentry, Roanoke, Va., on brief), for appellants.

Thomas B. Mason, U. S. Atty., and Lawrence C. Musgrove, Asst. U. S. Atty., for appellee.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge.

Virginia Erection Corporation (hereinafter Virginia) and its president, John P. Shields, were indicted under 18 U.S.C.A. § 1001 for making false statements under oath to an agency of the United States Government. Additionally, Shields and two employees of Virginia, Arthur Hayston and Blaine E. McGinity, were charged in an indictment under 18 U.S.C.A. § 371 with conspiring to defraud the United States Government.

These indictments grew out of the performance by Virginia of a contract between it and Hercules Powder Company (hereinafter Hercules) involving certain work at the Radford Arsenal, Radford, Virginia. The Radford Arsenal, a facility for the manufacture of military explosives, is wholly owned by the United States, under control of the Department of the Army, and operated by Hercules under a cost-plus-fixed-fee contract. By the contract between Hercules and Virginia, the latter agreed to clean, repair and paint ten water storage tanks at the Radford Arsenal for a *fixed fee*. Work was begun on July 13, 1959. Approximately five weeks later, on August 18, 1959, Hercules charged Virginia with breaching the contract and terminated it.

By its contract with Hercules, Virginia was required to submit each week correct copies of its payroll supported by sworn statements as to employees' classifications and wage rates paid. The indictment against Shields and Virginia under 18 U.S.C.A. § 1001, in two counts, charged the submission to Hercules of two affidavits, false as to classification of employees and hours worked.

The conspiracy indictment under 18 U.S.C.A. § 371 charged that Shields and two foremen of the corporation, Hayston and McGinity, conspired to defraud the United States.[1]

The two indictments were consolidated for trial and the four defendants were tried together before court and jury. All were convicted. Shields and Virginia have appealed, asserting procedural errors and challenging the sufficiency of the evidence. We think, in the interests of justice and for the reasons hereinafter stated, that a new trial should be awarded.

The defendants contend that reversible error was committed when the court permitted an alternate juror to retire to the jury room and remain there during jury deliberations. The circumstances may be briefly stated. During final arguments of counsel, Miss Furr, one of the twelve regular jurors, gave evidence of being ill. Although she was apparently well enough to continue as a juror, the court was understandably concerned about the possibility of a mistrial at such a late stage in the trial which had been in progress for several days.[2] The court

1. The indictment set forth and the evidence pointed to a number of overt acts allegedly committed in furtherance of the conspiracy, including defendants' instructions to employees (1) to paint certain portions of the storage tanks without first sandblasting them as required by the contract and falsely advise the inspectors that such areas had been sandblasted; (2) to sandblast an 80-foot riser tube approximately four feet down from the top and six feet up from the bottom and to falsely inform the inspectors that it had been completely sandblasted; and (3) to apply only one coat of paint, instead of two as required by the contract, to certain areas which were difficult to inspect and to inform the inspectors that two coats had been applied. The defendants had mixed with gasoline the paint applied to the storage tanks and had concealed that fact from Hercules.

2. A previous trial of the defendants resulted in a mistrial on the fourth day because of a malfunction of a recording machine which made it impossible to produce a transcript of the proceedings.

permitted the alternate juror, Mr. Sublett, to retire with the jury. The record seems to indicate that counsel for both the Government and the defendants agreed to this procedure.[3] The alternate juror was admonished by the court not to participate in the deliberations of the jury and to say nothing unless one of the regular jurors should become ill or "disqualified." Sublett remained with the twelve regular jurors throughout their deliberations.

Defendants assert that they were deprived of their constitutional right to trial by a properly constituted jury and that this procedure violated the applicable Federal Rules of Criminal Procedure.

▌ The inviolable right to trial by jury in criminal cases stems from two provisions of the Constitution of the United States. Article III, Section 2, Clause 3, provides that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; * * *." The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *." It is well established that "trial by jury" contemplated by Article III, Section 2, and the Sixth Amendment is a trial by a jury of twelve persons, *neither more nor less*. Patton v. United States, 281 U.S. 276, 288, 50 S.Ct. 253, 74 L.Ed. 854 (1930); Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898).

The Government contends that the defendants waived their right to object to any possible violation of constitutional rights and waived objection to noncompliance with the Federal Rules of Criminal Procedure. It relies principally upon the landmark decision in Patton v. United States, supra. In that case one of the jurors became disabled during trial but before the case was submitted to the jury. Thereupon counsel for the defendants and the Government stipulated in open court that the case should proceed with the remaining eleven jurors. The defendants *personally* assented and the trial court approved the stipulation. The Supreme Court held that the defendants had waived their right to a constitutional jury of twelve but made it clear that "before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the *express and intelligent consent of the defendant.*" (Emphasis supplied.) 281 U.S. 276, 312, 50 S.Ct. 253, 263.[4]

▌ Since the decision in Patton, the Federal Rules of Criminal Procedure were formulated after prolonged, careful and scholarly research and were adopted and promulgated by the Supreme Court of the United States. These rules have the force and effect of law and are binding on District Judges conducting criminal trials in the United States Courts.

Rule 23(b) provides as follows:

"Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12."

Should a situation similar to that in the Patton case now arise the procedure would be governed by Rule 23(b). That Rule makes it unmistakably clear that *a jury shall be of twelve* except that the

---

3. The only record indication of any agreement to send the alternate juror to the jury room is found in the following statement by the court made at the conclusion of its instructions to the jury: "I don't know whether I said it before I think I should say that this arrangement [sending the alternate to the jury room] has been agreed upon by counsel without objection on their part. * * *." There is nothing in the record to show that the defendants *personally* consented to the arrangement.

4. Numerous cases decided subsequently to Patton have held that a defendant may waive his right to a jury of twelve and consent to a verdict by a lesser number. See Rogers v. United States, 319 F.2d 5 (7 Cir. 1963); Taylor v. United States, 142 F.2d 808 (9 Cir.), cert. denied, 323 U.S. 723, 65 S.Ct. 56, 89 L.Ed. 581 (1944); Eury v. Huff, 141 F.2d 554 (4 Cir. 1944).

number may be *less* in the event the *parties so stipulate in writing.* But no rule makes provision for a jury of *more* than twelve.

The Federal Rules of Criminal Procedure make further provision for preserving the constitutional jury of twelve to which a defendant is entitled. In pertinent part, Rule 24(c) provides:

> "The court may direct that not more than 4 jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, *prior to the time the jury retires to consider its verdict,* become unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror *shall be discharged after the jury retires to consider its verdict."*

It is obvious that Rule 23(b) was intended to follow the teaching of Patton. Twelve is the magic number. If the number is to be reduced, a *written* stipulation of the parties provides the best record evidence of the *express* consent of a defendant. The obvious purpose of Rule 24(c) is to make adequate advance provision for meeting a situation where a regular juror becomes incapacitated or disqualified and the defendant relies upon his constitutional right to a jury of twelve. The delay and expense necessarily arising as consequences of a mistrial and starting afresh with a new jury are thus avoided.

Rule 24(c) is explicit in defining the function of an alternate juror and the time when his replacement of a disqualified regular juror begins, that is, *prior* to the time when the jury retires to consider its verdict. It further provides that an alternate juror who does not so replace a regular juror *shall be discharged* after the jury retires to consider its verdict.

The Committee history leading to the formulation and adoption of Rule 24 discloses that the United States Supreme Court Advisory Committee on Rules of Criminal Procedure seriously considered the possibility of permitting an alternate juror to replace a regular juror who becomes disabled *during* the jury's deliberations but rejected it after the desirability and constitutionality of such a procedure had been questioned by the Supreme Court.[5] Rule 24(c) patently makes no provision for the replacement of a juror who becomes disabled after the jury retires to deliberate. The rule makers were concerned with establishing procedures whereby the courts could avoid mistrials in protracted cases. The procedure followed in the case at bar, one which had been considered and rejected, was not only contrary to the letter but also to the spirit of Rule 24(c).

The Government contends that the case was heard and decided by a constitutional jury of twelve and that the presence of the alternate during jury deliberations was not prejudicial to the defendants. The defendants contend that the jury was either composed of thirteen or the deliberations of the twelve regulars were conducted in the presence of one who was legally a stranger.

It is certain that the alternate, Mr. Sublett, had no legal standing as a juror. Rule 24(c) required that he be discharged. Notwithstanding the fact that the court instructed him to say nothing and not to participate unless one of the regular jurors should become ill or disqualified, certain questions naturally arise. Who was to decide whether a regular juror was actually incapacitated or merely feigning illness or other disqualification to escape from prolonged arguments and discussions in the jury room? Would the decision be up to alternate Sublett, or the regular juror to be

---

5. See Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43, 46.

relieved, or eleven of the regular jurors, or all present? The record provides no answer. It clearly appears from certain facts to be hereinafter stated, as disclosed by the record, that court and counsel were fully aware that determining disqualification of a regular juror and ordering replacement by an alternate are strictly judicial functions.

▆▆▆▆ Whether, in fact, alternate Sublett obeyed the instructions of the court is not revealed by the record. It is, of course, possible that he could have remained silent during the deliberations. However, if he heeded the letter of the court's instructions and remained *orally* mute throughout, it is entirely possible that his attitude, conveyed by facial expressions, gestures or the like, may have had some effect upon the decision of one or more jurors. In any event, the presence of the alternate in the jury room violated the cardinal principle that the deliberations of the jury shall remain private and secret in every case.[6] The presence of any person other than the jurors to whom the case has been submitted for decision impinges upon that privacy and secrecy. It is possible that Sublett's presence may have operated to some extent as a restraint upon the jurors and their freedom of action and expression.

On the opening day of trial Miss Furr, the regular juror who subsequently became ill, informed the clerk of the court that she "knew a lot about paints and about the government" and expressed some doubt as to whether she should be on the jury. Her remarks were reported to the court in the presence of all counsel but were not considered of sufficient importance to require that action be taken. The case proceeded to trial. Apparently in accordance with local practice, the trial court permitted jurors to directly interrogate witnesses. During trial Miss Furr asked two questions—one directed to a Government witness and the other apparently to Government counsel—which seemed to the court to be weighted or slanted in favor of the defendants. Furthermore, Miss Furr made a statement to the court reporter when they were together in the ladies' room.[7] From Miss Furr's remarks to the clerk, her statement to the court reporter and her questions asked in open court, the trial judge concluded that it was necessary to question this juror concerning any possible bias against the Government and, over the objections of defense counsel, proceeded to conduct an inquiry.

Miss Furr was interrogated in chambers in the presence of all counsel, the court reporter, a deputy marshal and a notary public. The defendant Shields was not present. The proceedings were reported and, by stipulation, were made a part of the record. Although the court interrogated this juror as to whether she was prejudiced against either the Government or the defendants, the thrust of the inquiry was clearly directed at determining whether she was biased against the Government. The court recited to Miss Furr the remarks she had made to the clerk, her statement to the court reporter, and observed that one of the questions she had asked "was really not a question, but an argument which might very well be made by Mr. Gentry [defense counsel]." As to one of Miss Furr's questions the court commented:

> "There is no reason why you shouldn't ask any type of question that is merely designed to bring out the facts, but that question was obviously loaded in favor of the defense. That made us think that perhaps you had pretty well made up your mind

---

6. See Am.Jur., Trial, § 909 (1945).

7. This occurrence was recited by the court as follows:
   " * * * Now, the next incident that was reported *to me occurred last Friday* in the ladies' room when Mrs. Lane made some comment to the effect that she wished Mr. Shields would stop tapping on his microphone because it interfered with her reception. You [Miss Furr] spoke up quickly in defense of Mr. Shields saying something to the effect that if you were on trial for something that might affect your whole life you might act that way, too, or something to that effect. Is that correct?"

about the ultimate verdict in the case."

■ The nature of the questions indicates the court's concern that Miss Furr might be prejudiced against the Government and the mere fact that she was questioned by the court may have unduly impressed her. Such an inquiry is fraught with danger.[8] The trial judge occupies a position of great influence with the jury in the conduct of the trial and must be careful not "to say anything which might have the effect of prejudicing the cause of either party before those whose duty it is to decide on the facts." Virginian Ry. Co. v. Armentrout, 166 F. 2d 400, 405, 4 A.L.R.2d 1064 (4 Cir. 1948). In an effort to demonstrate a lack of prejudice against the Government, Miss Furr may have overtly attempted to display a favorable attitude toward the prosecution. There exists the grave danger that the interrogation of Miss Furr may have operated as a restraint upon her freedom to function as a juror.

■■ Although the objective of the District Court in seeking to avoid a mistrial is commendable, the means adopted to achieve that objective cannot be approved. Under applicable rules, one of two procedures could have been followed. If the court, in the rightful exercise of sound discretion, concluded that Miss Furr was disqualified either because of prejudice or illness, she could have been discharged at any time prior to the submission of the case to the jury and replaced by the alternate juror.[9] Under Rule 23(b) the court might have secured the written stipulation of the parties to a jury of less than twelve. The procedure here employed collides sharply with the Rules of Criminal Procedure and with traditional principles of jury secrecy. We deem it most unwise to place the judicial stamp of approval upon this attempt of court and counsel to circumvent the established rule and to substitute unauthorized procedures.

In view of our conclusion that the appellants are entitled to a new trial, we think it unnecessary to pass upon the sufficiency of the evidence. Upon a retrial the evidence may vary in material respects from that introduced before the jury which returned the verdict of guilty.

Reversed and remanded for a new trial.

8. Bacino v. United States, 316 F.2d 11, 15 (10 Cir. 1963); cf. Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

9. We do not intend to even intimate that the court abused its discretion in failing to disqualify Miss Furr. However, having decided that she should remain, the die was cast and the alternate should have been discharged.