**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Guy W. OLANO, Jr.,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond M. GRAY,**
**Defendant–Appellant.**

Nos. 87–3128, 88–3096 and 88–3295.

United States Court of Appeals,
Ninth Circuit.

Submitted on the Briefs as to
No. 87–3128.*

Argued and Submitted as to Nos. 88–3096
and 88–3295 March 5, 1990.

Submission Vacated March 7, 1990.

Resubmitted Nov. 19, 1990.

Decided May 31, 1991.

* The panel unanimously finds No. 87–3128 suitable for decision without oral argument. Fed.

R.App.P. 34(a); Ninth Circuit Rule 34–4.

Guy W. Olano, Jr., pro se.

Thomas C. Wales and Robert H. Westinghouse, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

John R. Muenster, Mestel & Muenster, Seattle, Wash., William J. Genego, University of Southern California Law Center, Los Angeles, Cal., for defendant-appellant Raymond M. Gray.

Before WRIGHT, REINHARDT and O'SCANNLAIN, Circuit Judges.

REINHARDT, Circuit Judge:

Appellants Olano and Gray appeal their convictions for participating in an elaborate "kickback" scheme involving loans between and among various officers and directors of savings and loan institutions.[1] At trial, the government asserted that Gray and Olano, along with several co-conspirators, including Davy Hilling and David Neubauer,[2] defrauded three thrift institutions by using their positions as directors and officers of their respective institutions to make unauthorized and unsound loans and to grant extensions of credit to each other in exchange for reciprocal loans, extensions

---

**1.** Specifically, Gray was convicted of conspiracy, wire fraud, transportation of stolen money, misapplication of funds, and false bank transactions, in violation of 18 U.S.C. §§ 371, 657, 1006, 1343, and 2314. Olano was convicted of conspiracy, aiding and abetting Gray in willfully misapplying funds, causing a false financial statement to be made, and transportation of stolen money, in violation of 18 U.S.C. §§ 371, 657, 1006, 1014.

**2.** The initial indictment charged Gray, Olano, Hilling, Neubauer, Joseph S. Ascani, Stewart P. Kalterman, Zaki S. Mansour, Brian G. Marler, and Jerome E. McCuin together. The district court granted Mansour's and McCuin's severance motion. The remaining defendants were charged in a superseding indictment. Ascani, Kalterman, and Marler were acquitted of all charges.

of credit, or kickbacks from the loan proceeds. Gray and Olano claim, *inter alia*, that there is insufficient evidence to sustain their convictions on certain counts. With respect to counts V, VI, and VII against Gray and counts VI and VIII against Olano, we find the evidence insufficient and therefore reverse the appellants' convictions. We reject Gray's contention that the evidence was insufficient as to counts III and IV, and likewise find the evidence sufficient to sustain Olano's convictions on counts III and IX. However, Olano and Gray also assert that the district court violated their right to a jury of twelve persons in allowing the two alternate jurors to retire to the jury room and remain there during jury deliberations. We agree and vacate the convictions of both appellants on all counts not reversed for insufficiency of evidence and remand for a new trial on those counts.[3]

## I. Facts and Procedural History

Throughout the alleged conspiracy, defendants Hilling, Neubauer, Gray, and Olano each had effective control over three savings and loan institutions: Hilling was chairman of the board of directors of Irving Savings Association in Irving, Texas; Neubauer was operations manager of I.C.R. Mortgage Bankers, Inc., a wholly-owned subsidiary of Irving Savings; Gray was chairman of the board of directors of Home Savings and Loan Association in Seattle, Washington; and Olano was chairman of the board of directors of Alliance Federal Savings and Loan Association in Kenner, Louisiana. These four defendants allegedly caused their respective institutions to transfer millions of dollars to each other by issuing loans and letters of credit. The government contends that, in carrying

out the scheme, the defendants frequently bypassed generally—accepted procedural and record-keeping practices, such as documenting the issuance of letters of credit, requiring collateral, and ensuring that the institutions' financial obligations were adequately underwritten.

On December 8, 1986, Gray and Olano were charged in a multi-count indictment in connection with the alleged kickback scheme. Gray was charged in eight of the counts and Olano in seven. Both appellants were charged with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371 (count I); wire fraud, in violation of 18 U.S.C. § 1343 (count II); interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (count III); misapplication of funds, in violation of 18 U.S.C. § 657 (count IV); false statements, in violation of 18 U.S.C. § 1006 (count VI and VIII). Gray was charged separately on two additional counts of violating § 1006 (counts V and VII). Olano was charged separately with submitting false loan documents for the purpose of influencing Home Savings, in violation of 18 U.S.C. § 1014 (count IX).

After approximately three months of trial, the jury, along with two alternate jurors, retired for deliberations. The jury found Gray guilty of all counts in which he was charged (counts I—VIII). Olano was found not guilty of count II, but was convicted on the remaining counts in which he was charged (counts I, III—VI, VIII, and IX). Gray and Olano were sentenced to a series of three consecutive five-year terms and were ordered to make full restitution to the financial institutions.[4] Gray and Olano were also sentenced to five years probation commencing upon their release from custody.

---

3. Appellants raise other substantial issues, including the applicability of the rule set forth in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) and *United States v. Hilling*, 863 F.2d 677 (9th Cir.1988) to the jury instructions given in this case. The appellants also challenge the district court's decision to conduct the trial on one afternoon in the absence of a juror. In view of the conclusion we reach with respect to the Rule 24(c) violation, it is unnecessary for us to address those issues.

4. Failing to appear for sentencing, Gray was indicted for and convicted of violating 18 U.S.C. §§ 3146(a) and (b). The district court imposed a five-year probation sentence for his conviction on this count. We affirmed, but remanded for resentencing, since the sentence was based on erroneous information. *See United States v. Gray*, 876 F.2d 1411 (9th Cir.1989).

On May 26, 1987, before the conclusion of trial, the district judge suggested that the two alternate jurors be allowed to remain with the jury during deliberations, unless the parties had an objection.[5] The following day, the court asked defense counsel "whether you want the alternates to go in and not participate." Olano's counsel responded, "We would ask that they not." No more discussion took place that evening. However, on May 28, just before the prosecution's rebuttal argument, the following colloquy took place:

THE COURT: Do I understand that the defendants now—it's hard to keep up with you, counsel. This is sort of a day by day—but that's all right. You do all agree that all fourteen deliberate?

Okay. Do you want me to instruct the two alternates not to participate in deliberation?

MR. KELLOGG [counsel for co-defendant Hilling]: That's what I was on my feet to say. It's my understanding that the conversation was the two alternates go back there instructed that they are not to take part in any fashion in the deliberations.

While it appears that Kellogg spoke on behalf of all defense counsel, Olano's and Gray's counsel did not expressly consent. More important, the record does not show express personal consent from either defendant; nor does it reflect that either defendant understood what was being waived. Indeed, Olano claims that he was

not even present for this colloquy because he (unlike the other defendants) was incarcerated at the time and the marshals had not yet returned him to the courtroom after the lunch recess.[6]

Informing the jury of the procedural modification, the district judge stated:

[S]ince the law requires that there be a jury of twelve, it is only going to be a jury of twelve. But what we would like to do in this case is have all [fourteen] of you go back so that even the alternates can be there for the deliberations, but according to law, the alternates must not participate in the deliberations. It's going to be hard, but if you are an alternate, we think you should be there because things do happen in the course of lengthy jury deliberations, and if you need to step in, we want you to be able to step in having heard the deliberations. But we are going to ask that you not participate.

The alternate jurors then retired with the jury, which began its deliberations.[7]

## II. Analysis

### A. Sufficiency of the Evidence

Gray contends that the evidence introduced at trial was insufficient to support his convictions on counts III, IV, V, VI, and VII. Olano argues that his convictions on counts III, VIII and IX should be reversed for insufficiency of the evidence. Both Olano and Gray moved for judgments of acquittal under Fed.R.Crim.P. 29. The dis-

---

5. The district judge explained:

It's strictly a matter of courtesy and I know many judges have done it with no objection from counsel. One of the other things it does is if they don't participate but they're there, if an emergency comes up and people decide they'd rather go with a new alternate rather than 11, which the rules provide, it keeps that option open. It also keeps people from feeling they've sat here for three months and then get just kind of kicked out. But it's certainly not worth—unless it's something you all agree to, it's not worth your spending time hassling about, you know what I mean? You've got too much else on your mind. I don't want it to be a big issue; it's just a suggestion. Think about it and let me know.

6. Although the record does not indicate whether or not Olano was present for the colloquy, his

assertion that he was absent finds some support in the record. Olano cites an earlier portion of the Reporter's Transcript in which the court expressed dissatisfaction with the marshal's tardiness in returning him to court. The government now contends that Olano must have been present for the colloquy, since the court reporter would have undoubtedly noted the unexpected absence of Olano from the proceedings. However, the passage cited by Olano tells us that he was *sometimes* late in returning, but the government fails to cite a single instance in which the transcript reflects that fact.

7. During deliberations, the district court excused one of the alternates upon his request. The other alternate remained with the jury throughout the deliberations until the jury reached its verdict.

trict court denied their motions. Viewing the evidence in the light most favorable to the prosecution, we must determine whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See United States v. Washington Water Power Co.,* 793 F.2d 1079, 1081 (9th Cir.1986).[8]

### 1. Count III: Gray

Gray contends that the evidence was insufficient to support his conviction on Count III for willfully causing the interstate transportation (via wire transfer) of $2.346 million from Home Savings to Alliance Federal, knowing that the money had been taken by fraud, in violation of 18 U.S.C. § 2314.[9]

To support a conviction under § 2314, the government must prove beyond a reasonable doubt that Gray (1) transferred or caused to be transferred across state lines (2) monies valued at $5000 or more (3) with the knowledge that such monies had been stolen, converted, or taken by fraud. Gray first argues that there was insufficient evidence to establish his intent to deprive Home Savings of the transferred funds, because, prior to wiring the funds, he had agreed with Shepherd, the president of Home Savings, that the recipient of the funds would be instructed to hold them until Shepherd granted further approval. The record shows that Shepherd gave that instruction but the wire operator inadvertently omitted it. Gray claims that, absent the omission, the funds would never have been disbursed, and that because he did not cause the omission, he did not intend that the money be transferred to Alliance Federal.

To establish that Gray "transferred" the funds in violation of § 2314, the prosecution need only show that Gray *caused* the money to be transferred, not that he personally transferred it. *United States v. Vaccaro,* 816 F.2d 443, 455 (9th Cir.1986), *cert. denied sub nom. Alvis v. United States,* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987), and *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987); *United States v. Gundersen,* 518 F.2d 960, 961 (9th Cir.1975) (quoting *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)). Jurors may infer intent from circumstantial evidence. *United States v. Kaplan,* 554 F.2d 958, 964 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). The evidence established that Gray underwent considerable efforts to ensure the transfer of the funds. He prepared a commitment letter on Home Savings stationery in Olano's office and used his influence at Home Savings to expedite the loan approval process. Shepherd testified that, notwithstanding the fact that the underwriting process had not yet been completed, Gray pressured him into wiring the funds by threatening to terminate his employment. The fact that Gray agreed to allow Shepherd to place a hold on the funds is not determinative. The prosecution introduced evidence from which a jury could reasonably infer that Gray believed a hold on the funds would be meaningless. Gray apparently knew that Olano exerted considerable influence over the account to which the funds were transferred. The record shows that, under the wire instructions, the funds were to be credited to Alliance Federal through the escrow account. Gray, Olano, and McCuin intended to fund the $2.346 million loan from Home Savings through an account McCuin had at Alliance Federal. More important, the evidence shows that it was Shepherd, not Gray, who sought to place the hold on the funds and

---

8. We review the appellants' insufficiency of the evidence claims before considering the jury issue because reversal for insufficient evidence would result in acquittal. Reversal on the basis of appellants' remaining claims would permit a retrial.

9. 18 U.S.C. § 2314 makes it a crime for an individual to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud."

who assumed responsibility for releasing the hold at the appropriate time. Gray merely yielded to Shepherd's demand in allowing him to place such restrictions on the account. The record demonstrates that Gray's efforts went solely to ensuring that the funds were wired immediately. Shepherd's failed attempt to block the ultimate transfer does not immunize Gray from responsibility for causing it. Thus, a jury could reasonably have concluded beyond a reasonable doubt that Gray ultimately caused the money to be transferred to Alliance Federal.[10]

■ Gray also contends that the evidence was insufficient to prove that he knew the funds were procured by fraud. Specifically, he claims that the only fraud associated with the transfer of funds was McCuin's and Mansour's production of false income tax returns and McCuin's submission of a false financial statement to Home Savings. The prosecution did not introduce any evidence regarding Gray's knowledge of McCuin's and Mansour's false submissions. However, it proffered ample other evidence of fraud associated with the loan so that a jury could reasonably have concluded beyond a reasonable doubt that Gray knew the monies were taken by fraud. According to the evidence introduced by the government, Gray intentionally deceived the officers and directors of Home Savings by concealing his interest in the McCuin loan. That is, the McCuin loan was simply another facet of the elaborate kickback scheme in which Gray participated. A jury could reasonably have found that Gray's failure to inform Home Savings of this scheme, including his own interest in the McCuin loan, constituted fraud, as the loan might never have been granted if the other directors and/or officers had known of his interest. We therefore reject

Gray's contention that there was insufficient evidence with respect to his knowledge that the loan was procured by fraud and find the evidence sufficient to support his conviction on Count III.

### 2. Count IV: Gray

Gray was convicted on Count IV for willfully misapplying Home Savings' funds, in connection with the McCuin loan, with the intent to defraud, in violation of 18 U.S.C. § 657.[11] Gray claims that the evidence was insufficient to prove that he (1) "willfully misapplied" the funds and (2) had the "intent to defraud" Home Savings.

■ In defining "willful misapplication," courts have generally stated that a person willfully misapplies bank funds by converting them to his, or a third party's, use, benefit, or gain. *United States v. Payne*, 750 F.2d 844, 856 (11th Cir.1985) (citing *United States v. Britton*, 107 U.S. 655, 666–67, 2 S.Ct. 512, 522, 27 L.Ed. 520 (1883)). Gray asserts that his agreement with Shepherd to place a hold on the funds precluded any rational factfinder from concluding that he was responsible for the actual conversion of the funds. In *United States v. Stuart*, 718 F.2d 931 (9th Cir. 1983), we held that the *actual* disbursement of money is not a prerequisite for conviction for misapplication of monies under § 657. *Id.* at 933. Rather, evidence that a defendant instigated the approval of loans larger than necessary—because they included amounts for kickbacks—is sufficient to prove misapplication of funds. Here, the prosecution introduced evidence that Gray pressured Home Savings to fund the McCuin loan to benefit his alleged co-conspirator, Olano. The record shows that McCuin received a $340,000 "furniture allowance" for his role in applying for the loan. A reasonable juror could have in-

---

10. Although the statute makes the transfer across state lines unlawful, the indictment describes the specific offense with which Olano is charged as being the transfer (across state lines) to Alliance Federal.

11. 18 U.S.C. § 657 provides in pertinent part:
  · Whoever, being an officer, agent or employee of or connected in any capacity with ... any land bank, intermediate credit bank, ...

[or] savings and loan ... association ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both
  ....

ferred from this evidence that the payment to McCuin represented a kickback for his participation in securing the loan and that the necessity for such a kickback made the initial loan amount excessive. Once again, Gray's attempt to rely upon his agreement with Shepherd to place a hold on the funds is of no help to him. A reasonable juror could have concluded that Gray knew that any hold on the funds would be illusory and that his efforts in causing Home Savings to make loans in excess of the amounts needed would have the effect of diverting bank funds from their intended purposes. Such evidence is sufficient to establish a willful misapplication of bank funds.

■ Gray also argues that the evidence was insufficient to prove that he intended to defraud Home Savings. We disagree. The prosecution's evidence tended to show that Gray defrauded Home Savings by concealing his involvement in the kickback scheme and that Gray intended unlawfully to deprive the institution of its property by causing it to issue loans in excess of the appropriate amount.

Viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence for a reasonable jury to have found beyond a reasonable doubt that Gray misapplied funds in violation of § 657.

### 3. Counts V, VI, and VII: Gray

■ Counts V, VI, and VII charged Gray with issuing Home Savings financial obligations "without being duly authorized," in violation of 18 U.S.C. § 1006.[12] Gray contends that the government failed to prove beyond a reasonable doubt that he was "not authorized" to issue these obligations.[13]

§ 1006 provides in pertinent part:
Whoever, being an officer, agent or employee of or connected in any capacity with ... any lending, mortgage, insurance, credit or savings and loan corporation or association ... *without being duly authorized,* draws any order or bill of exchange, makes any acceptance, or issues, puts forth or assigns any note, debenture, bond or other obligation ..., or, with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*Id.* (emphasis added). Even in the light most favorable to the prosecution, a review of the record demonstrates that the government failed to prove beyond a reasonable doubt that Gray was *not* authorized to issue the obligations.

The two principal items of evidence the government points to are the statements of John Morris, a government agent, and of John Shepherd, the president of Home Savings. These items are insufficient to support the government's burden. Federal Home Loan Bank Board Supervisory Agent Morris testified that he informed Gray in March 1984 that "the proper role of a director is not to be involved in the lending decisions" of a financial institution. Gray stated that he understood and agreed to refer lending opportunities to the appropriate officers of Home Savings. However,

---

**12.** Count V involves a Home Savings take-out loan for $4 million. Count VI relates to a $2.346 loan commitment letter. Count VII is based on an unconditional letter of credit for $3.4 million in favor of defendant Marler, which he used as collateral to obtain an Alliance Federal loan.

**13.** Gray also argues that the loan commitments that are the subject of counts V and VI were conditional commitments and thus not "obligations" within the meaning of § 1006. We need not reach this issue, given our resolution of his authorization argument. For purposes of addressing the question whether Gray was authorized to issue the commitments, we will assume that such commitments constitute obligations under the statute.

according to Morris' testimony, he informed Gray of a director's "proper role" not in order to officially instruct or admonish him, but to ensure that Gray, who had little banking experience, was aware of "the implications of appearances of conflict of interest in his business dealings and as his role as a new director of a savings and loan." Thus, Morris' statements did not purport to delineate any regulatory rule restricting Gray's conduct; they simply set forth a normative rule which apparently stemmed from Morris' many years of experience in the banking industry.[14]

The defense introduced uncontroverted evidence that the allocation of lending authority to various officers and directors varies among financial institutions. Norman Jenson, a government witness, testified that it is not uncommon for a chairman of the board of an institution to issue obligations and that this practice was found throughout the industry.[15] Thus, in order to prove that Gray did not have authority to issue the obligations, the prosecution should have presented evidence regarding the procedural rules or policies of Home Savings.

The government did not introduce sufficient evidence of Home Savings' rules or policies in regard to the allocation of lending authority. Indeed, the government, despite its own witness' recommendation, did not introduce either the articles of incorporation or the corporate bylaws for Home Savings, or, in fact, any corporate resolutions. The government relies heavily on the testimony of Home Savings' president. It contends that John Shepherd testified that no one may commit Home Savings without Board approval and that this testimony was sufficient to establish the rules regarding lending authority at that institution. However, Shepherd's testimony does not yield such an unambiguous characterization of Home Savings' rules and policies. Shepherd testified that, "I don't *think* that anybody has the right to commit the institution without the proper actions being taken by the institution, but I'm also aware that an officer's signature on a commitment can be binding to the institution, whether it's proper or not." (emphasis supplied). Shepherd's statement does not purport to set forth an official institutional rule—formal or informal—only his own informal opinion as to the authority of the institution's officers, and not its directors, which Gray was. Moreover, his testimony does not identify the source of his informal opinion, and fails to provide a basis upon which a reasonable juror could have concluded that Gray reasonably should have known of any such "rule."[16]

14. With respect to the character of Morris's statements to Gray, other testimony undermines any contention that Morris officially instructed or reprimanded Gray. Charles Brook, a supervisory agent for both FSLIC and the FHLBB testified that verbal requests made by FSLIC or FHLBB personnel are not binding on an institution. Similarly, Henry Holden, a FHLBB field manager testified that it is FHLBB "policy ... not to give a verbal warning without a follow up confirmation in writing." There is no indication in the record that Morris ever instructed or admonished Gray in writing. Nor, incidentally, do we think that even if he did the evidence would be sufficient, because the statements pertained to normative, not regulatory, rules.

15. David Resha testified that in his 16 years as a loan officer and president of a savings and loan association he had never known a director or a chairman of the board to issue a commitment of an institution without a corporate resolution authorizing that act. This testimony merely suggests that directors ordinarily do not issue commitments without corporate resolution. It does not, however, reflect the rules in effect at Home Savings for any given period. Nor does it vitiate Jenson's testimony that a director *may* issue commitments.

Additionally, the testimony of Ashley Branning, who served on the Home Savings board of directors, and Charles Brooks, a supervisory agent with FSLIC and FHLBB, comport with Jenson's testimony. Both Branning and Brooks stated that authority to issue loan commitments differs in every institution.

16. The only other evidence on which the government relies is Gray's statement that he should not have issued the $3.4 million commitment to Marler and the absence from the minutes of a Home Savings board meeting relating to the McCuin loan of any reference to the commitment. Gray's statement is highly ambiguous, at best, and could just as easily refer to the merits of the loan as to his authority or lack thereof. The failure of the minutes to mention the commitment is of no consequence in the absence of testimony explaining the significance of that failure.

We conclude that the prosecution failed to introduce sufficient proof that the procedures or policies of Home Savings denied Gray authority to issue the obligations. Accordingly, we reverse Gray's convictions on counts V, VI, and VII for insufficiency of the evidence. This determination requires a reversal of Olano's conviction on Count VI for aiding and abetting Gray.

### 4. Count III: Olano

■ Olano contends that there was insufficient evidence to support his conviction on Count III for the interstate transportation of funds taken by fraud, in violation of 18 U.S.C. § 2314, because (1) there was no evidence that he had knowledge that the wiring of the funds would be improper and (2) the owner of the funds, Home Savings, consented to that wiring. These claims lack merit. The prosecution introduced evidence that Olano knowingly concealed his interest in the loan. The government's evidence suggests that the $2.346 million loan was primarily for the benefit of Olano, who desperately sought to pay off his debt for the Dauphine Condominiums. According to the government's evidence, Gray and Olano obtained McCuin's assistance by paying him $340,000 from the loan proceeds as a "furniture allowance." Moreover, the closing statement submitted to Home Savings by Olano falsely represented that McCuin paid $414,000 as a cash down payment. Olano also received approximately $25,000 in legal fees for this transaction from the proceeds of the loan, without the knowledge of Home Savings. Thus, there is sufficient evidence to show fraudulent conduct on the part of Olano. It follows that he was aware that wiring the funds would be unlawful. Olano's second argument is equally unavailing. Home Savings' consent is irrelevant. Moreover, the evidence shows that Home Savings' "consent" to disburse

the funds was given as a result of the fraudulent scheme manufactured by Gray and Olano. We therefore reject Olano's claim that the evidence was insufficient to support his conviction on Count III.

### 5. Count VIII: Olano

■ Count VIII charged Olano with aiding and abetting the defrauding of Home Savings with respect to a $2.346 million loan *"in that,* in return for this loan, Guy W. Olano *caused* Raymond M. Gray to receive reciprocal accommodation loans from Alliance Federal" (emphasis added) in the amounts of $3,400,000, $2,550,000, and $450,000, all in violation of 18 U.S.C. § 1006. The "in that" clause specifies the wrongful conduct the government must prove in order to obtain a conviction on the particular count involved. Olano asserts that the prosecution failed to introduce any evidence that a fraud was perpetrated on the directors or officers at Alliance Federal or that he *caused* the loans to be received by Gray. Our review of the record leads us to agree with Olano. The record yields no evidence which could reasonably support a conclusion that Olano caused Alliance Federal to issue the "reciprocal" loans to Gray. There is no evidence that Olano pressured any officer or director into approving the loans; there is no evidence that Olano participated in drafting the letters of commitments describing the purposes of the loans; nor is there evidence that Olano in any way facilitated Alliance Federal's making of the loans to Gray.[17] The record indicates that Stewart Kalterman, senior executive vice-president of Alliance Federal and president of Alliance Financial Services (a wholly-owned subsidiary of Alliance Federal which was responsible for underwriting and servicing loans extended by the association), orchestrated the approval of the "reciprocal" loans. Any conclusion

---

**17.** Olano instructed William Delsa, an attorney employed in Olano's law office, to prepare the necessary legal documents to transfer title to the Battle Ridge Ranch, which Gray and Marler owned jointly, to Marler alone, in order to avoid exceeding the "loans to one borrower" ceiling. While this evidence suggests that Olano was involved in advising Gray how best to go about

applying for the loan, it does not provide a basis from which a jury could have reasonably inferred that Olano *caused* the loan to be made to him. It is worth noting, incidentally, that Delsa testified that he did not believe that the transfer of title for the purpose of meeting the "loans to one borrower" requirement was in any way illegal or improper.

that Kalterman acted at the behest of Olano rests upon speculation, as we find nothing in the record to support such a conclusion.

■ The government asserts that the evidence of the conspiracy among Olano, Gray, Hilling, and Neubauer was sufficient circumstantial evidence for the jury to infer that Olano used his position as chairman of the board of Alliance Federal to ensure the approval of the reciprocal loans to Gray. We disagree. The prosecution has the burden of showing that the conspiracy extended to the loans to Gray and that Olano used his position as chairman to cause that loan to be made. The prosecution's burden is not met by abstract reference to the fact that Olano was involved in a "kickback" scheme. Rather, the prosecution must show with some specificity that Olano in some fashion caused Alliance Federal to make the particular loans in question. While a reasonable jury could have concluded that Olano indirectly obtained the $2.346 million loan from Home Savings by fraud, it could not automatically infer that the loans to Gray arose under the fraudulent scheme. More important, in the absence of probative evidence, it could not infer that Olano caused the loans to be made to Gray. The record before us demonstrates that the prosecution did not introduce sufficient evidence as to any of those considerations. Accordingly, we reverse Olano's conviction on Count VIII and order him acquitted of that charge.

6. Count IX: Olano

■ In Count IX, Olano was charged with causing false statements to be presented to Home Savings in conjunction with a $2.346 million loan to McCuin, in violation of 18 U.S.C. § 1014.[18] The superseding indictment states that, in a false financial statement, Olano represented that $414,000 in cash had been received from McCuin as a down payment, and that $99,060.44 had been paid to real estate agencies as commissions. In fact, no cash had been received from McCuin and no fees were paid to the real estate agencies listed in the document. McCuin received $340,000, and $30,000 had been paid to another real estate agency.

Olano asserts that he had no involvement whatsoever with the preparation of the false closing statement; he neither prepared nor signed the document containing the false statements. The critical question here is whether there was sufficient evidence upon which a jury could reasonably have concluded that Olano was responsible in whole or in part for the fact that the closing statement set forth false material information. The false statements were prepared by Olano's notarial secretary, Jane McLaughlin,[19] who transcribed the false figures from a purchase agreement. McLaughlin testified that she did not recall who prepared the purchase contract in the Dauphine Condo project. On cross-examination, however, she acknowledged that Joseph Ascani signed the purchase agreement on behalf of Olano. The government also raised doubts about the veracity of McLaughlin's statement that Olano had no role in the actual preparation of the closing statement by eliciting testimony that she *may* have relied on information provided by Olano and that she was unduly loyal to Olano.

Randall Roth, an attorney who worked in Olano's law office, testified that Olano ne-

---

**18.** At the time of Olano's trial, 18 U.S.C. § 1014 provided in pertinent part that:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... a Federal Savings and Loan Association ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security

therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

**19.** According to McLaughlin's testimony, a "notarial secretary" assists real estate agents or attorneys by preparing and witnessing (i.e. attest to the signature of the person signing) real estate sales documents. A "notary," on the other hand, executes documents—i.e. reviews the documents with the purchaser and seller, signs and affixes his seal on the documents.

gotiated the terms of the purchase agreement, in particular the $340,000 furniture allowance to McCuin. From this evidence, a jury could reasonably have inferred that Olano instructed his secretary to exclude from the closing statement certain figures listed in the purchase agreement. Such an inference would have permitted a reasonable jury to conclude that Olano "caused" false statements to be submitted to Home Savings. We therefore reject Olano's contention that the evidence was insufficient to sustain his conviction on Count IX.

### B. Alternate Jurors' Presence During Deliberations

#### 1. Standard of Review

Neither Olano nor Gray expressly objected to the district court's decision to retain the alternate jurors after the jury retired to consider its verdict. Accordingly, we review this issue for plain error. *United States v. Perez*, 491 F.2d 167, 173 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974).

#### 2. Limited Role of Alternate Jurors Under the Federal Rules

Rule 24(c) of the Federal Rules of Criminal Procedure provides in pertinent part:

The court may direct that not more than 6 jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, *prior to the time the jury retires to consider its verdict,* become or are found to be unable or disqualified to perform their duties.... An alternate juror who does not replace a regular juror *shall be discharged after the jury retires* to consider its verdict.

Fed.R.Crim.P. 24(c) (emphasis added). Rule 23(b) complements and must be read along with Rule 24(c). Rule 23(b) provides

that, before or after the completion of the trial proceedings, parties may stipulate to a jury of less than 12; after the jury has retired, the judge may for good cause, with or without the consent of the parties, provide that a verdict may be returned by a jury of 11.[20] In 1983, the Advisory Committee on Rules squarely rejected the proposal to allow alternate jurors to be present during jury deliberations, or to permit them, regardless of their physical location during the initial part of the jury proceedings, to substitute for regular jurors after the deliberations have commenced. The Advisory Committee noted the inherent constitutional and practical difficulties with such practices. It observed that "there does not appear to be any way to nullify the impact of what has occurred without the participation of the new juror." F.R.Crim.P. Rule 23(b) (1990 ed.) (Advisory Committee Notes to 1983 Amendment). The Advisory Committee concluded specifically that the practice "of sending in the alternates at the very beginning with instructions to listen but not to participate until substituted" is impractical and constitutionally impermissible. *Id.*

We have not previously directly resolved the question of the validity of a verdict when alternate jurors are permitted to be present during the jury's deliberations. However, the language of Rule 24(c), Rule 23(b), the Advisory Committee Notes to Rule 23, and related Ninth Circuit precedent clearly establish that the presence of alternate jurors during deliberations when there is any reasonable possibility that they may affect the verdict violates the Rule. *See, e.g., United States v. Rubio*, 727 F.2d 786, 799 (9th Cir.1983); *United States v. Lamb*, 529 F.2d 1153, 1156–57 (9th Cir. 1975) (en banc).

Although Rule 24(c) is phrased in unmistakably mandatory language and does not expressly provide for any waiver,

---

**20.** F.R.Crim.P. Rule 23(b) provides:

Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it neces-

sary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

we have allowed defendants to consent to a waiver of its requirements under some circumstances. However, in all such cases involving either Rule 23(b) or Rule 24(c), we have required that the record show that the defendants, and not merely their counsel, actually consented to the waiver of their rights. *See United States v. Guerrero–Peralta*, 446 F.2d 876, 877 (9th Cir.1971) (holding that defense counsel's assertion that defendant has consented, even if defendant acquiesces in defense counsel's assertion is insufficient to waive jury of 12 requirement under Rule 23(b)); *United States v. Reyes*, 603 F.2d 69, 71 (9th Cir. 1979) (concluding that "the *defendant's* expression of consent on the record must appear at the time the stipulation is made" in order to meet Rule 23(b)'s waiver requirements (emphasis added)); *see also United States v. Crisco*, 725 F.2d 1228, 1230 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984) (affirming waiver of Rule 24(c) based on written stipulation signed by the government, defense counsel, and the defendant personally); *United States v. Foster*, 711 F.2d 871, 885–86 (9th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984) (enforcing written stipulation with respect to Rule 24(c) signed by all the defendants and their counsel).[21]

We note that the requirement that an expression of the *defendant's* consent appear on the record "serves more than the evidentiary purpose of providing reliable evidence that the defendant has in fact consented.... [It] underscore[s] the significant decision faced by the parties." *Reyes*, 603 F.2d at 71. The requirement that the trial court receive express personal consent from the defendant alerts the defendant to the fact that a waiver of Rule 24(c)'s protections may affect the outcome of the case. It suggests to him that the alternate jurors' presence during deliberations may amount to participation in the decision-making process—whether in explicit or more subtle forms—as one or more of the deliberating jurors may modify his or her factual determinations and ultimately rest a verdict, in part, on the alternate jurors' "expressions" of their opinions.[22]

**21.** In one case decided shortly after Rule 24 was adopted, we upheld a juror substitution that occurred after deliberations had commenced even though there was no express personal consent by the defendants. *See Leser v. United States*, 358 F.2d 313, 317–18 (9th Cir.), *cert. dism'd*, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966). In *Leser*, however, counsel for defendants had stipulated to the substitution both prior to the time the jury began deliberations and thereafter. In fact, as the court noted, the issue was discussed repeatedly in the presence of the defendants. We held that, under the circumstances, the appellants had knowingly and intelligently acquiesced in the waiver.

We have serious doubts that *Leser* is of continuing vitality. All of our subsequent cases have either involved or required personal consents from defendants, both under Rules 23(b) and 24(c). Moreover, in amending Rule 23(b) in 1983, the drafters made it absolutely clear that alternate jurors should not be substituted. The drafters instead gave the district court discretion to allow a jury of 11 to return a valid verdict if cause existed for excusing one of the jurors after the commencement of jury deliberations. *See* Fed.R.Crim.P. Rule 23(b) (as amended April 28, 1983, eff. Aug. 1, 1983). Finally, *Leser* would not apply in any event, because in that case the court expressly distinguished the circumstances in which more than 12 jurors were present during deliberations. *See Leser* 358 F.2d at 318. Specifically, *Leser* distinguished the *Virginia Erection* line of cases, see discussion *infra*, on the ground that in those cases the alternate juror was permitted to go into the jury room with the regular jurors and remain there during deliberations, whereas in *Leser* there were never more than 12 jurors present during deliberations. Our case falls in the *Virginia Erection* category, rather than under *Leser*.

**22.** With respect to a defendant's waiver of his right to a constitutional jury of twelve under Rule 23(b), we observed in *dicta* that "[a]n oral stipulation may, under certain circumstances, satisfy the Rule, but it must appear from the record that the defendant personally gave express consent in open court, intelligently and knowingly, to the stipulation." *Guerrero–Peralta*, 446 F.2d 876, 877 (9th Cir.1971). Subsequently, in *Reyes*, we cast some doubt on whether an oral stipulation might be enough and emphasized the need to follow the explicit language of Rule 23(b), which calls for stipulations in writing. *Reyes*, 603 F.2d 69, 71–72 (9th Cir. 1979). At the same time, we suggested that a thorough investigation by the district judge might be adequate to validate an oral waiver under Rule 23(b). However, we did not *decide* whether under appropriate circumstances an oral waiver might suffice, as we reversed on the ground that there was no indication in the record that the defendant consented to the waiv-

■ Here, the record shows that neither Olano nor Gray ever gave his personal consent to the presence of the alternates during jury deliberations. Moreover, the record is unclear with regard to the question whether counsel for either defendant ever specifically consented to the waiver, although counsel for appellants' co-defendant certainly did. We may assume, *arguendo*, that co-defendant's counsel spoke as counsel for all defendants on this issue. Even so, his consent was insufficient to meet the requirements set forth by *Guerrero–Peralta* and *Reyes*, because the district court did not obtain individual waivers from each defendant personally, either orally or in writing. Nothing in the record suggests that the defendants intelligently and knowingly consented personally to a waiver of their rights under the Rule. We therefore hold that the district court did not obtain valid consents from the defendants to deviate from Rule 24(c)'s mandatory requirements.

### 3. District Court's Error Prejudices Defendants' Substantial Rights

■ We conclude that permitting unauthorized persons to be present in the jury room while the jury is deliberating, in violation of Rule 24(c), is inherently prejudicial. The presence of alternate jurors, even if they are instructed not to participate, infringes upon the jury's privacy and the secrecy of the jury process. *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir.1964). The Advisory Committee on the Federal Rules of Criminal Procedure, agreeing with the reasoning of the Fourth Circuit in *Virginia Erection*, stated that "the possibility of sending in the alternates at the very beginning with instructions to listen but not to participate until substituted ... is ... attended by practical difficulties and offends 'the cardinal principle that the deliberations of the jury shall remain private and secret in every case.' *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir.1964)." Fed.R. Crim.P. 23(b) (1990 ed.) (Advisory Committee Notes to 1983 Amendment).

We cannot fairly ascertain whether in a given case the alternate jurors followed the district court's prohibition on participation. However, even if they "heeded the letter of the court's instructions and remained *orally* mute throughout, it is entirely possible that [their] attitude[s], conveyed by facial expressions, gestures or the like, may have had some effect upon the decision of one or more jurors." *Virginia Erection Corp.*, 335 F.2d at 872. As Judge Wright wisely observed over fifteen years ago in *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975) (en banc):

> [T]he presence of an alternate juror in the jury room ... "destroys the sanctity of the jury." *United States v. Beasley*, 464 F.2d 468, 470 (10th Cir.1972). The mere presence of the alternate may well have an effect on the deliberations of the twelve....
>
> When an alternate is present in the jury room, thereby violating the privacy of jury deliberations, a problem of constitutional dimension arises. There is thus greater justification for a rule of reversal per se where an alternate is present during deliberations ... than where an alternate is substituted after deliberations have commenced. *See Leser v. United States*, 358 F.2d 313, 318 (9th Cir), *petition for cert. dismissed*, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966).

*Id.* at 1160 (Wright, J., dissenting). Although Judge Wright's prescient remarks were contained in a dissent, the majority opinion is fully consistent with his view.

Given the difficulty of ascertaining the numerous, and often subtle, ways alternate jurors can impinge upon the privacy of the jury, given the potential that their presence may in fact affect the deliberating jurors' ultimate determination if they are allowed to be present, and given the emphatic adoption of the *Virginia Erection* principles by the Advisory Committee on the Federal Rules, we conclude that the district court's deviation from Rule 24(c) without the ex-

---

er at all. Here, we are faced with the same circumstance. Again, we need not decide

whether an oral stipulation would ever be sufficient.

press, personal consent of the defendants was inherently prejudicial. Absent a valid personal waiver by the defendants, allowing alternate jurors to be present during jury deliberations constitutes a violation of Rule 24(c) and requires a reversal of the verdict.[23]

### 4. Application of Olano's Arguments to Gray

Gray did not raise in his brief the issue regarding the district court's deviation from the procedural requirements of Rule 24(c). However, at oral argument, Gray requested that he be allowed to adopt Olano's arguments regarding the alternate jurors issue. Ordinarily, we would limit each defendant's appeal to the issues specifically raised and argued in his brief. *See United States v. Loya*, 807 F.2d 1483, 1486–87 (9th Cir.1987). However, Rule 2 of the Federal Rules of Appellate Procedure gives us discretion to suspend the Rules for "good cause shown," or if a failure to review an issue not properly presented would result in manifest injustice. *See id.* at 1487. We believe it would be manifestly unjust to reverse Olano's conviction and not Gray's when both suffered the same prejudice from the same fundamental error in the same trial. *See United States v. Rivera Pedin*, 861 F.2d 1522, 1526 n. 9 (11th Cir.1988); *United States v. Gray*, 626 F.2d 494, 497 (5th Cir.1980), *cert. denied sub nom. Fennell v. United States*, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), *cert. denied* 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981), *cert. denied sub nom. Barker v. United States*, 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981); *United States v. Anderson*, 584 F.2d 849, 853 (6th Cir.1978). Therefore, we consider Olano's Rule 24 argument adopted by Gray for purposes of this appeal.

### 5. Summary

It is certainly understandable that a trial judge who is nearing the end of a long trial would have concerns about the prospect of trying the case again. Nevertheless, we must all heed Rule 23(b)'s and Rule 24(c)'s unambiguous instructions on how to handle alternate jurors: At the close of trial, the district judge should discharge all the alternate jurors as required by Rule 24(c) and must thereafter resolve any unexpected vacancies by proceeding in the manner provided in Rule 23(b). Under Rule 23(b), when vacancies occur after the discharge of the alternates, the parties may agree to the return of a verdict by 11 or fewer jurors, or, if they fail to do so, the district judge may direct that a verdict by 11 jurors will suffice. However, absent the defendant's valid consent, no alternate should be permitted to join the jury, or be substituted for a juror, once deliberations begin. Here, the district court's decision to allow the alternates to remain present during deliberations without the defendants' express personal consent to a waiver of the rules constitutes plain error. Accordingly, we vacate the convictions of both Olano and Gray on all counts, other than those which we have reversed, *supra*, on the ground of insufficiency of the evidence.

### III. Conclusion

Gray's convictions on counts V, VI, and VII are reversed because there was insufficient evidence to support the convictions. Likewise, Olano's convictions on counts VI and VIII are reversed for insufficiency of the evidence. The appellants are ordered acquitted on these counts. With respect to the remaining counts, the convictions are vacated, but the government is not barred from retrying the appellants. The judgment of the district court is reversed in part; the convictions on the remaining counts are vacated, and the case is remanded for further proceedings consistent with this opinion.

REVERSED in part; VACATED and REMANDED in part.

---

**23.** Because the violation is inherently prejudicial and because it infringes upon a substantial right of the defendants, it falls within the plain error doctrine. *See United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir.1986) (citations omitted).